# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| LEANN ROSSI, THERESA | : | |
| MCGRUDER, ANSLEY PASCOLI, | : | |
| DEBRA POOLE, CHERYL SMALLS, | : | |
| and REBECCA CANADA, | : | |
| | : | **CIVIL ACTION FILE NO.** |
| Plaintiffs, | : | **1:10-CV-4254-RWS-AJB** |
| | : | |
| v. | : | |
| | : | |
| FULTON COUNTY, GEORGIA, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND
## NON-FINAL REPORT AND RECOMMENDATION

In this action, Plaintiff Theresa McGruder raises employment-discrimination claims against Defendant Fulton County, Georgia, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*. (Am. Compl. [Doc. 16]). Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Theresa McGruder. [Doc. 161]. For the reasons set forth below, the undersigned **RECOMMENDS** that the motion be **GRANTED IN PART and DENIED IN PART**.

## I.    Background

As required when considering a motion for summary judgment, the Court has

viewed the evidence and reasonable factual inferences in the light most favorable to

Plaintiff, the nonmoving party.[1]  *See United States v. Four Parcels of Real Prop.*,

941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  To the extent that material facts are in

dispute, the Court has resolved the disputes in Plaintiff's favor.[2]  *See Vaughan v. Cox*,

_____

[1]    Paragraph numbers preceded by "D" refer to Defendant's Statement of Material Facts, as to Plaintiff Theresa McGruder, to Which There Are No Genuine Issues To Be Tried, filed in support of its motion for summary judgment, [Doc. 161-1], and paragraph numbers preceded by "P" refer to Plaintiff Theresa McGruder's Statement of Material Facts Which Present a Genuine Issue for Trial, [Doc. 211-3], filed in opposition to Defendant's motion for summary judgment.  Plaintiff's and Defendant's responses to the statements of material fact will be designated as "Pl. Resp.," [Doc. 211-2], and "D. Resp.," [Doc. 220-1], respectively.

[2]    The Court notes that for the purposes of resolving a motion for summary judgment, "facts" may not be considered unless they are unopposed or supported by citations to admissible evidence.  *See* Fed. R. Civ. P. 56(c); LR 56.1(B).  For this reason, when the opposing party has pointed out that the evidence cited to support a factual statement is unsupportive, the Court has edited the fact to recite only the portion supported by the evidence, and in cases in which the citation is absent or unsupportive, the Court has omitted the statement of fact entirely.  (*See, e.g.*, P ¶¶ 38, 208, 210, 238, 307, 309, 310, 313, 362, 382, 416-17, 424, 451; D ¶ 194).

The Court also recognizes that Plaintiff has objected to Defendant's reliance on affidavits submitted by Brian Gardner, (P. Resp. ¶ 33), Henry Brigham, (P. Resp. ¶ 44), Curtis Pilgreen, (P. Resp. ¶ 50), David Gilstrap, (P. Resp. ¶ 71), Jacqueline Davis, (P. Resp. ¶ 246), and Rhonda Augustine, (P. Resp. ¶ 246), because, Plaintiff contends, Defendant did not list them as potential witnesses on its Amended Response to Initial

AO 72A
(Rev.8/8
2)

343 F.3d 1323, 1326 n.1 (11th Cir. 2003). The Court does not, however, accept legal conclusions, masquerading as facts, as true.[3] *See Day v. Taylor*, 400 F.3d 1272, 1277 (11th Cir. 2005). The facts of the case, for the purpose of adjudicating Defendant's motion for summary judgment, are therefore as follows.[4]

---

Disclosures. (*See, e.g.*, P. Resp. ¶ 157 citing [Doc. 150 at 10-12] and Fed. R. Civ. P. 37(c)(1)). Gardner was listed as a potential plaintiff's witness. [Doc. 25 at 7]. Because Defendant incorporated Plaintiff's list of potential witnesses into its own list, the Court finds that Defendant disclosed its possible reliance on Gardner. [*See* Doc. 150 at 10]. The objection is therefore **OVERRULED** as to Gardner. It does appear, however, that Defendant failed to disclose Brigham, Pilgreen, Gilstrap, Jacqueline Davis, and Augustine. [*See* Doc. 25 at 7; Doc. 150 at 10-12]. Consequently, the objections as to those witnesses are **SUSTAINED**, and the Court therefore disregards any portion of Defendant's statements of fact that rely on Brigham, Pilgreen, Gilstrap, Jacqueline Davis, or Augustine's testimony.

[3] Accordingly, the Court has disregarded statements of material fact that state legal conclusions. (*See, e.g.*, P ¶¶ 50, 339, 369).

[4] The Court notes that between the two parties' statements of material fact, 726 factual statements are presently before the Court. [*See* Docs. 161-1, 211-3]. Given this volume, it is not surprising that many of the statements are repetitive or only tangentially related to the claims Plaintiff raises. Thus, a significant number of the statements need not—and will not—be recited in this Report and Recommendation. The facts recited in this section are intended to establish the context of the case. Additional facts pertinent to the parties' arguments will also be recited in the discussion section below. Statements of fact that have no apparent materiality and are not referenced in the parties' arguments have not been included. *Cf. Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (refusing to supply argument for party).

AO 72A
(Rev.8/8
2)

Plaintiff, who was born on August 4, 1953, is a female over forty years of age. (D ¶¶1-2; P. Resp. ¶¶ 1-2). She became employed with Defendant in April 1979 as a data entry operator. (D ¶ 3; P. Resp. ¶ 3). Plaintiff was promoted to the position of Real Property Appraiser in or around 1987. (D ¶ 4; P. Resp. ¶ 4). As a Real Property Appraiser, Plaintiff's duties included gathering data to determine the estimation of value for properties located in Fulton County on a mass appraisal basis. (D ¶ 5; P. Resp. ¶ 5).

Plaintiff was promoted to the position of Senior Appraiser in or around 1995. (D ¶ 6; P. Resp. ¶ 6). In addition to performing the duties she performed as a Real Property Appraiser, in her role as Senior Appraiser, Plaintiff supervised, collected and reviewed the work of an appraisal staff and performed other duties as assigned by her manager. (D ¶ 7; P. Resp. ¶ 7).

Plaintiff was appointed to the position of Appraisal Manager in or around 2005. (D ¶ 8; P. Resp. ¶ 8). As an Appraisal Manager, Plaintiff oversaw an appraisal staff of eight or more employees, consisting of the senior appraiser, appraiser, appraiser trainees and data collectors. (D ¶ 9; P. Resp. ¶ 9). Plaintiff was assigned to manage Fulton County's 14th District, which spans from Inman Park down to the Clayton County line, and includes neighborhoods such as the Vine City, Pittsburgh,

AO 72A
(Rev.8/8
2)

Mechanicsville, Lakewood, West End and Grant Park communities. (D ¶ 10; P. Resp. ¶ 10). Leann Rossi was one of the appraisers assigned to the 14th District under Plaintiff's supervision. (D ¶ 11; P. Resp. ¶ 11).

The management hierarchy within the Fulton County Tax Assessor's Office is as follows: (1) Chief Appraiser; (2) Assistant Chief Appraiser, (3) Deputy Chief Appraiser, and (4) Appraisal Managers. (D ¶ 12; P. Resp. ¶ 12). Burton Manning served as Chief Appraiser of the Tax Assessor's Office from July 2006 until February 2012. (D ¶¶ 13-14; P. Resp. ¶¶ 13-14). As Chief Appraiser, Manning had the overall responsibility for the office of the Tax Assessors' Office, including approval of all training and travel requests within the department and final decisionmaking authority as to all hiring, promotion, and disciplinary decisions.[5] (D ¶¶ 15-17; P. Resp.

---

[5]    Although Plaintiff denies that Manning was the final decisionmaker as to all hiring, promotion, and disciplinary decisions because "Manning merely 'rubber stamped' the decisions made by George, so long as George had 'dotted his "I's" and crossed his "T's" beforehand,' " (P. Resp. ¶¶ 16), the Court finds that even if true, Plaintiff's statement does not negate the fact that Manning had ultimate hiring, promotion, and disciplinary decisionmaking authority. Additionally, the deposition testimony Plaintiff cites for her own corresponding statement of material fact does not support the assertion that Manning "rubber stamped" George's decisions, (see P ¶ 382 (citing Deposition of Burton Manning ("Manning Dep.") [Doc. 230] at 67, 85; Deposition of Douglas A. Kirkpatrick ("Kirkpatrick Dep.") [Doc. 299] at 30-31). Consequently, the Court deems Defendant's statement 16—the statement regarding Manning's authority over personnel decisions—to be admitted.

¶¶ 15-17). Tony George served as Assistant Chief Appraiser from June 2006 until April 2010. (D ¶ 19; P. Resp. ¶ 19). As Assistant Chief Appraiser, George was responsible for the day-to-day operations of the Tax Assessor's Office, including successfully guiding the office in preparing the annual tax digest and efficiently and effectively handling appeals for Fulton County. (D ¶ 20; P. Resp. ¶ 20). Douglas Kirkpatrick was hired as the Deputy Chief Appraiser on November 18, 2008. (D ¶¶ 22-23; P. Resp. ¶¶ 22-23). As Deputy Chief Appraiser, Kirkpatrick was responsible for the day-to-day operations of the residential division of the Tax Assessor's Office. (D ¶ 24; P. Resp. ¶ 24).

During the time period relevant to the allegations in this suit, there were four Appraisal Managers in the Residential Division: Kevin Maxey, Timothy Brown, Debra Poole, and Plaintiff. (P ¶ 6; D. Resp. ¶ 6; D ¶ 26; P. Resp. ¶ 26). Maxey, a male born on January 31, 1968, became employed with Defendant in 1992, was promoted to Appraisal Manager and assigned to the South Region in 2007, until he was reassigned to the 14th District in January 2010, after Plaintiff retired. (P ¶ 293; D. Resp. ¶ 293; D ¶¶ 27-31; P. Resp. ¶¶ 27-31). Brown, a male "over the age of 40," became employed with Defendant on October 18, 1995, and has served as Appraisal Manager of the North Region since 2004. (D ¶¶ 37-40; P. Resp. ¶¶ 37-40). Poole, who is female and was

6

born on May 25, 1956, held the role of Appraisal Manager over the 17th District until she was terminated in 2009 and Tony Johnson (a male born on September 13, 1963) was promoted into the Appraisal Manager position in the 17th District in January 2010. (P ¶¶ 118, 289, 292; D. Resp. ¶¶ 118, 289, 292; Affidavit of Tony Johnson ("Johnson Aff.") [Doc. 177] ¶¶ 2, 4; Deposition of Debra A. Poole ("Poole Dep.") [Doc. 191] at 164).

In 2008, Darlene Davis, the Financial Systems Manager for the Fulton County Tax Assessor's Office, presented Plaintiff with a performance appraisal George had prepared for the period of November 2007 to June 2008. (D ¶¶ 41, 100; P. Resp. ¶¶ 41, 100). George had issued Plaintiff an appraisal rating of 1.6 out of a maximum score of 3, which indicated that Plaintiff's performance needed improvement. (D ¶ 101; P. Resp. ¶ 101). Plaintiff disagreed with the rating she received from George and refused to sign the appraisal. (D ¶ 102; P. Resp. ¶ 102). George also issued a performance appraisal to Poole in August 2008; he gave her a score of 1.5 out of 3. (P ¶¶ 210, 212; D. Resp. ¶¶ 210, 212). In the "performance summary" section of the appraisal form, the reviewer could "summarize the reason for the employee's overall rating, including any strengths or weaknesses that are pertinent

7

to the appraisal." (P ¶ 216; D. Resp. ¶ 216). The section was blank on both Plaintiff's and Poole's forms. (P ¶ 217; D. Resp. ¶ 217).

On October 10, 2008, George called a meeting with Plaintiff's staff to discuss mortgage fraud. (D ¶ 245; P. Resp. ¶ 245). McGruder and Rossi both raised their hands indicating that they would like to speak, but George ignored them. (P ¶ 301; D. Resp. ¶ 301). Rossi then asked for and received permission to go the bathroom. (P ¶ 302; D. Resp. ¶ 302). She returned with two large books containing extensive research and analysis that she had compiled and performed in 2007 regarding mortgage fraud in the 14th District. (P ¶¶ 303, 305; D. Resp. ¶¶ 303, 305). Rossi asked George if she could speak regarding the information contained within the books, and George obliged. (P ¶ 306; D. Resp. ¶ 306; Deposition of Theresa R. McGruder ("Pl. Dep.") [Doc. 194] at 42). George then interrupted Rossi and asked her to leave the meeting. (P ¶ 307; D. Resp. ¶ 307). Before leaving, Rossi questioned George regarding why women were not receiving the same tools as men. (P ¶ 308; D. Resp. ¶ 308). Rossi was again asked to leave. (P ¶ 310; D. Resp. ¶ 310). That same day, Rossi filed a grievance in which she stated that "Tony George was disrespectful and verbally abusive and made derogatory remarks pertaining to the manner in which I perform my job. He dismissed my attempt to make suggestions

8

during a department meeting and displayed the same behavior towards my manager and co-workers during this meeting." (Deposition of Lean Rossi ("Rossi Dep."), Exh. 8 [Doc. 195-1 at 178]). Rossi requested "A written apology for his current actions and behavior, and the protection of Fulton County that he may not retaliate as he had done in similar situations." (*Id.*). As Rossi's manager, Plaintiff had to comment on the grievance. (D ¶ 250; P. Resp. ¶ 250). In her comments, Plaintiff described the incident as "personality conflict" between George and Rossi, and she did not recommend any discipline for Rossi. (P ¶ 316; D. Resp. ¶ 316; D ¶ 251; P. Resp. ¶ 251).

Following the mortgage-fraud meeting, George wrote a memo to Manning recommending that Rossi be terminated for insubordination. (P ¶ 325; D. Resp. ¶ 325; D ¶ 248; P. Resp. ¶ 248). On October 21, 2008, George sent an interoffice memorandum to Manning also recommending that Plaintiff be terminated. (D ¶ 103; P. Resp. ¶ 103). George wrote:

> Theresa McGruder has not perform[ed] her job description, by not addressing mortgage fraud in the 14th District for the past three years. I have personally come across blocks and blocks and neighborhood after neighborhood of properties that have been affected by mortgage fraud in relation to the value that she and her appraisers have put on these properties. Mrs. McGruder has been chasing sales or spot assessing properties in the 14th district which is not a desired practice according to IAAO standards. In light of these facts coming to my attention, I do not have any confidence in Theresa McGruder's ability to direct the staff of

AO 72A
(Rev.8/8
2)

appraisers under her supervision in the 14th District. I am recommending to you that Theresa McGruder be terminated immediately.

(D ¶ 104; P. Resp. ¶ 104[6]; Manning Dep., Exh. 5 [Doc. 230-8]). Manning, however, took no immediate disciplinary action against Plaintiff. (D ¶ 105; P. Resp. ¶ 105).

Rossi later met with Manning to discuss the incident between Rossi and George. (P ¶ 320; D. Resp. ¶ 320; Rossi Dep. at 86-87). Manning told Rossi that she would not get an apology from George, and that if she did not resolve the grievance that she filed she would be suspended for two weeks. (P ¶ 321; D. Resp. ¶ 321; Rossi Dep. at 86-87). On November 7, 2008, Rossi formally resolved and withdrew her grievance. (P ¶ 322; D. Resp. ¶ 322).

On the morning of June 16, 2009, Rossi entered Maxey's office and alleged that Orlando Allen, a temporary employee under Maxey's supervision, was spying on her in the parking lot. (D ¶ 255; P. Resp. ¶ 255). Maxey perceived Rossi's tone, demeanor, and behavior as belligerent, disrespectful, and insubordinate. (D ¶ 256; P. Resp. ¶ 256[7]). Accordingly, he wrote an account of the incident and gave it to

---

[6]     Plaintiff objects and argues that the content of the letter is not true. (P. Resp. ¶ 104). The contents are recited here not for the truth of the matter asserted but rather to show what George wrote to Manning.

[7]     Plaintiff objects to this statement of fact because "Maxey's perception of Rossi's tone, demeanor and behavior constitutes Maxey's opinion rather than an

AO 72A
(Rev.8/8
2)

Deputy Chief Appraiser Kirkpatrick. (D ¶ 257; P. Resp. ¶ 257). When Plaintiff arrived at work, Kirkpatrick called a meeting with Rossi, Plaintiff, and Maxey to discuss the incident. (D ¶ 258; P. Resp. ¶ 258). Following Rossi's recount of that morning's events, Kirkpatrick instructed Plaintiff to issue a written reprimand to Rossi. (D ¶ 259; P. Resp. ¶ 259). Plaintiff objected to Kirkpatrick's instructions as she was not present during the encounter between Maxey and Rossi. (D ¶ 260; P. Resp. ¶ 260). Although Maxey had already written a reprimand that could have been issued to Rossi, Kirkpatrick explained that it was appropriate for Plaintiff to issue the reprimand because she, not Maxey, was Rossi's immediate supervisor. (P ¶¶ 333-34; D. Resp. ¶¶ 333-34; D ¶ 261; P. Resp. ¶ 261). Kirkpatrick also advised Plaintiff that she would be terminated if she did not issue the written reprimand to Rossi. (D ¶ 262; P. Resp. ¶ 262). Ultimately, Plaintiff issued the reprimand to Rossi. (D ¶ 263; P. Resp. ¶ 263).

On July 20, 2009, Plaintiff was summoned to a meeting with Manning, Kirkpatrick, and Davis. (D ¶ 106; P. Resp. ¶ 106). Manning advised Plaintiff that he was moving in a different direction and her services were no longer needed.

_____

objective fact." (P. Resp. ¶ 256). The Court accepts the statement for the purposes of establishing the context of Plaintiff's case, not for establishing that Maxey's perception was correct.

(D ¶ 107; P. Resp. ¶ 107). Plaintiff was presented with the option of retiring or being terminated. (D ¶ 108; P. Resp. ¶ 108). She opted to retire to preserve her pension benefits. (D ¶ 109; P. Resp. ¶ 109). Plaintiff's resignation was effective August 4, 2009, the day she turned 56 years old. (P ¶ 288; D. Resp. ¶ 288; D ¶ 110; P. Resp. ¶ 110; Pl. Dep. at 201). Maxey was then reassigned to work as the Appraisal Manager in the 14th District. (D ¶ 115; P. Resp. ¶ 115).

On July 20, 2009, Poole was also given the option to retire or be terminated. (P ¶ 282; D. Resp. ¶ 282). She was also told that the Assessor's Office was "moving in a new direction" and that her position was no longer needed. (P ¶¶ 283-84; D. Resp. ¶¶ 283-84; Poole Dep. at 74-75). Poole did not agree to retire and was officially terminated on August 7, 2009. (P ¶ 286; D. Resp. ¶ 286; Poole Dep., Exh. 14 [Doc. 191-1 at 33]). In January 2010, Johnson was reassigned to work as the Appraisal Manager in the 17th District. (P ¶ 292; P. Resp. ¶ 292). Neither Maxey nor Brown was terminated. (P ¶ 291; D. Resp. ¶ 291).

Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about September 4, 2009.[8]

_____

[8]     The EEOC assigned the matter Charge No. 410-2009-05865. (Pl. Dep., Exh. 1 [Doc. 194-1 at 3]).

AO 72A
(Rev.8/8
2)

(D ¶ 270; P. Resp. ¶ 270; Pl. Dep., Exh. 1 [Doc. 194-1 at 3]). In the section of the form indicating the cause of the alleged discrimination, Plaintiff checked the boxes marked "sex," "age," and "retaliation," and also checked the box marked "other" and specified "42 U.S.C. [§§] 1983 & 1985." (Pl. Dep., Exh. 1 [Doc. 194-1 at 3]). She also indicated that the discrimination took place from 2008 through July 20, 2009. *Id.* The particulars of Plaintiff's charge were as follows:

> I am a Black Female over 40 years of age. My employer for the last 30 years was the Fulton County Board of Assessors. I was a supervisor over a number of appraisers in the tax assessors office until I was terminated from my job in July, 2009. I have been a Level 4 appraiser since 2004, which is the highest designation given. I was qualified to perform my job and received many compliments on my job performance and in my job evaluations. I believe I have been discriminated against because of my sex and age, and retaliated against because I supported a White Female employee who complained about treatment against women and whites to management who are predominately Black Males, particularly, Assistant Chief Appraiser, Tony George.

> When Assistant Chief Appraiser Tony George became employed by the Board of Assessors he made every effort to assist and give preferential treatment to the men in the office, and make work more difficult for the females. The men received work tools such as Blackberrys (PDAs) and laptop computers, but the females, including me, did not receive such tools for our jobs. The men were allowed to go on educational trips to Las Vegas and Austin, Texas, but the females were not. The females were excluded from Board of Assessor meetings, which we had attended for years until Tony George took over. The men were allowed and encouraged to attend Board Meetings. Tony George and top management ignored the requests of female supervisors and employees, directed and

13

moved our staff around, and transferred staff to different offices without consultation with the females, and refused to communicate with female supervisors about their staff or about staff assignments. However, top management always talked to the males regarding utilization of their staff. Tony George and other top management made every effort to impede the females from performing their jobs effectively, but gave every possible assistance to the males in equal or lesser positions.

Numerous times recently including this year top management asked me when I was going to retire, and strongly urged me to retire. I expressed that I did not want to retire, but they kept asking regularly. I was asked about retirement by Burt Manning, Chief Appraiser, and by Darlene Davis, head of Human Resources on numerous occasions.

In May or June of this year a fellow employee, Leann Rossi (White Female), spoke up in a meeting with Tony George asking that the women receive the same tools as the men including Blackberrys and laptops. A few weeks later Ms. Rossi complained to management about a male stalker early one morning as she was coming to work. The individual worked for the Board of Assessors in a clerical position and was a long-time friend of Tony George. The result was that the men wrote up Leann Rossi and reprimanded her, allegedly for causing a scene with her supervisor. The males in the office told me to write her up and gave me a document to sign as her immediate supervisor. I expressed to them that this was wrong, and that she was improperly being written up for complaining about a safety concern. I was ignored and forced to sign the reprimand since they wanted a female supervisor to sign the reprimand. At the end of June, 2009, Leann Rossi was transferred to the Alpharetta office from the downtown Pryor Street office because she had complained to management about discrimination and other poor treatment of females by management.

On July 20, 2009 I was called into the office of Chief Appraiser, Burt Manning, and offered the option of termination or retirement. He told me that the BOA was moving in another direction and my services were no

14

longer needed.  Shortly thereafter my vacant position was posted and advertised for employees and others to put in requests to be considered for the position.

I believe I have been discriminated against because of my sex and age, and retaliated against for opposing discrimination against other female employees in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and 42 USC Sections 1983 & 1985.

(*Id*. at 4-5).  On September 30, 2010, the EEOC issued a notice of right to sue in which it explained that it was terminating its processing of the charge because more than 180 days had elapsed since the date the Commission assumed jurisdiction over the charge, the Commissioner had not filed suit, and Plaintiff had requested the notice. [Doc. 1-1 at 12].

Plaintiff, along with Rossi, Poole, and two others, filed suit on December 30, 2010.[9]  [Doc. 1].  Plaintiff McGruder raises claims in Counts Two, Three, and Five. (*See* Am. Compl., *passim*).  She alleges in Count Two that Defendant violated the ADEA when it denied her "tools and opportunities . . . that younger employees were given." (*Id*. ¶ 198).  Specifically, Plaintiff asserts that she was excluded from meetings that younger employees were allowed to attend; management

_____

[9]    On March 21, 2011, the Court granted leave to add a sixth plaintiff. [Doc. 10].

15

AO 72A
(Rev.8/8
2)

"changed up the staff" on managers over 40 but not on younger employees; Plaintiff and others over 40 were not given "updates and information concerning their jobs, while younger employees were given such information"; Defendant restricted Plaintiff's use of county vehicles but did not do the same with younger employees; top management repeatedly asked her when she would retire; positions were "systematically filled with younger employees as older employees were pushed out; and after Plaintiff was offered the option of retirement or termination, her position was subsequently filled by a "substantially younger employee, upon information and belief." (*Id*). She alleges in Count Three that Defendant committed gender discrimination in violation of Title VII when Plaintiff "failed to receive tools and privileges of employment that male employees received from Defendant." (*Id*. ¶ 210). Specifically, Plaintiff asserts that she was excluded from meetings that male employees were allowed to attend; management communicated with male employees but ignored Plaintiff and other females; Defendant was hostile and abusive to her and other females during meetings; Plaintiff and other women were not given "updates and information" but provided it to male employees; management changed the staff around on female managers but not on males; Defendant restricted Plaintiff's use of county vehicles but did not do the same with male employees; top management repeatedly asked her when

16

she would retire but "did not treat male employees this way"; and Plaintiff was terminated and replaced with a male employee. (*Id*). She also generally avers that "Plaintiffs were treated differently, harassed, humiliated, abused, insulted, ignored, transferred, demoted, reduced in status and responsibility, denied promotions, disciplined, terminated, retaliated against and otherwise discriminated against by Defendant's officers and management based on their gender." (*Id.* ¶ 215). She alleges in Count Five that Defendant retaliated against her in violation of Title VII when it terminated her employment for supporting Rossi's allegations of unequal treatment and refusing to write Rossi up. (*Id.* ¶¶ 225-26, 231). Defendant moves for summary judgment on all of Plaintiff's claims. [Doc. 161].

## II.     *Standard of Review*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Only when that burden has been met does the burden shift to the non-moving

party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999).

18

### III. Legal Framework

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

The ADEA likewise makes it unlawful for an employer, *inter alia*, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also prohibits discrimination against any employee because she "has opposed any

AO 72A
(Rev.8/8
2)

practice made unlawful by this section, or because such individual . . . has made a charge, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). The Eleventh Circuit Court of Appeals has held that the same "principles governing the order and allocation of proof in cases arising under Title VII" apply to claims arising under the ADEA as well. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995).

A plaintiff asserting a disparate-treatment discrimination claim under Title VII can support her claim either by direct or circumstantial evidence. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). If direct evidence of intentional discrimination does not exist or is insufficient, a plaintiff may offer circumstantial evidence, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

> This framework requires the plaintiff to establish a *prima facie* case of discrimination, and then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action it took. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. The plaintiff can establish pretext by showing that the employer's non-discriminatory reason should not be believed, or, when considering all the evidence, that it is more likely that

20

the discriminatory reasons motivated the decision than the employer's proffered reasons.

*Lawver*, 300 Fed. Appx. at 772 (citations omitted).

"The methods of presenting a prima facie case are flexible and depend on the particular situation." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). Generally speaking, to satisfy a *prima facie* case for a disparate-treatment claim based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown v. Jacobs Eng'g, Inc.*, 401 Fed. Appx. 478, 479-80 (11th Cir. Oct. 28, 2010) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Regarding pretext,

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.

AO 72A
(Rev.8/8
2)

*Alvarez*, 610 F.3d at 1265-66 (alteration in original) (quoting *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks omitted)). To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala*., 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1228 (11th Cir. 1993)). In other words, a plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

## IV.    Discussion

Defendant moves for summary judgment on all of Plaintiff's claims on the grounds that Plaintiff cannot establish a *prima facie* case of age or gender discrimination or retaliation. [Doc. 161-2]. Specifically, Defendant argues that there is no evidence the Plaintiff was subjected to an adverse employment action or that someone outside of her protected class was treated more favorably. [*Id*. at 6-10]. It also contends that Plaintiff's refusal to support Rossi's termination or reprimand her

AO 72A
(Rev.8/8
2)

was not statutorily protected conduct and that Plaintiff had no reasonable good-faith belief that it was. [*Id*. at 16-18]. Defendant also contends that Plaintiff cannot show any causal connection between her allegedly protected activity and any adverse employment action. [*Id*. at 18]. Defendant further argues that even if Plaintiff could establish a *prima facie* case of discrimination or retaliation with regard to the claims arising from her allegedly wrongful discharge, Defendant can overcome the inference of discrimination with legitimate nondiscriminatory reasons for the decision. [*Id*. at 11-15].

Plaintiff, in response, contends that she has established *prima facie* claims of age and gender discrimination and that Defendant "has not proffered evidence in support of its alleged 'legitimate non-discriminatory reasons' for the adverse employment actions suffered by [Plaintiff] that is extensive enough to succeed on a motion for summary judgment." [Doc. 211-1 at 2]. She also argues that summary judgment should be denied because she has presented "significantly probative evidence of pretext." [*Id*.].

The arguments and responses are discussed in further detail below. The Court first addresses the arguments regarding Plaintiff's ability to establish a *prima facie* case of retaliation or disparate treatment. It then looks to the arguments regarding pretext.

23

## A. Prima Facie Case

Because it presents the simpler issue, the undersigned first considers whether Plaintiff has established a *prima facie* case of retaliation and then addresses the disparate-treatment claims.

### 1. Retaliation

To establish a *prima facie* case for a retaliation claim, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action[10]; and (3) there was a causal link between the two. *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11ᵗʰ Cir. 2010); *see also Johnson v. Booker T. Washington*

---

[10] In *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11ᵗʰ Cir. 2008), the Eleventh Circuit recognized that the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), broadened the type of employer conduct considered actionable in a retaliation claim, from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment- or workplace-related. *Crawford*, 529 F.3d at 973. Therefore, as result of *Burlington Northern* and *Crawford*, the Court concludes that it is inappropriate to refer to this element as the adverse employment action element. *Burlington Northern* explicitly states that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern*, 548 U.S. at 67. The Court's decision merely requires the employee to show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination. *Id.* at 68 (quotation marks and citations omitted). Thus, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.

AO 72A
(Rev.8/8
2)

*Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). To satisfy the first element, a plaintiff need not prove the underlying claim of discrimination that led to her protected activity; it is sufficient if he had "a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566; *see also Standard*, 161 F.3d at 1328 ("[I]t is sufficient that an employee have a good faith, objectively reasonable belief that [her] activity is protected by the statute."). As for the second element, a materially adverse action is one that " 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Reeves v. DSI Sec. Servs., Inc.*, 395 Fed. Appx. 544, 547 (11th Cir. Aug. 31, 2010) (quoting *Burlington Northern*, 548 U.S. at 68). " '[P]etty slights, minor annoyances, and simple lack of good manners' generally do not rise to the level of materially adverse actions." *Reeves*, 395 Fed. Appx. at 547 (quoting *Burlington Northern*, 548 U.S. at 68). To satisfy the third prong, Plaintiff is only required to show that the "protected activity and the adverse action were not wholly unrelated." *Shotz v. City of Plantation*, 344 F.3d 1161, 1180, n.30 (11th Cir. 2003) ("[A] plaintiff satisfies this element if [she] provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action.") (alteration and citation omitted); *see also Shotz*,

25

344 F.3d at 1180, n.30 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (one month between protected activity and adverse action supports finding of causation)).

Defendant argues that Plaintiff's retaliation claim fails on the first and third prongs. [Doc. 161-2 at 15-18]. Defendant first argues that Plaintiff cannot show that she held an objectively reasonable belief that she was opposing discriminatory conduct when she refused to support Rossi's termination following the disagreement with George in 2008 and when she refused to reprimand Rossi in June 2009. [Doc. 161-2 at 17]. It points out that Plaintiff described the 2008 incident involving George and Rossi as a "personality conflict" and that she objected to issuing a reprimand to Rossi in June 2009 because she was not present during the encounter between Maxey and Rossi. [*Id*. at 17-18]. Defendant also contends that even if Plaintiff did engage in protected activity, there is no causal connection between her activity and any adverse employment action. [*Id*. at 18].

Plaintiff, in response, argues that her refusal to reprimand Rossi in October 2008 was statutorily protected because Rossi had "rightly complained about women not receiving the same tools as men." [Doc. 211-1 at 15]. She further states that George recommended Plaintiff for termination only weeks later and avers that "[t]here is

26

evidence in the record that this recommendation was relied upon by Manning when he forced [Plaintiff] to retire" in 2009. [*Id*. at 15-16 (citing P ¶ 398)]. Plaintiff also argues that her refusal to reprimand Rossi in June 2009 was protected under Title VII because she "believed that Maxey and Kirkpatrick wanted a woman to reprimand Rossi to avoid the appearance of discrimination." [Doc. 211-1 at 16]. Plaintiff also notes that the 2009 incident took place about a month before she was force to retire. [*Id*.].

In reply, Defendant argues that "the record is devoid of any credible evidence that [Plaintiff] subjectively believed" that she was opposing a statutorily protected employment practice in either instance. [Doc. 220 at 13-14]. It further contends that (1) there is no evidence linking George's 2008 termination recommendation to Plaintiff's 2009 retirement; (2) none of Plaintiff's contemporaneous statements mentioned discriminatory treatment of women; and (3) Plaintiff's complaint and deposition testimony conflict with her present assertions that she refused to reprimand Rossi in 2009 because she believed that Maxey and Kirkpatrick wanted a woman to give the reprimand to avoid the appearance of discrimination. [*Id*. at 13-15 & nn.19-21].

27

### a. October 2008 Incident

With regard to the October 2008 incident, the undersigned finds that Plaintiff has not presented evidence sufficient to enable a reasonable factfinder to determine that she held an objectively reasonable good-faith belief that she was engaging in statutorily protect activity when she refused to support Rossi's termination. To show that she held such an objectively reasonable good-faith belief, Plaintiff must show that the employer conduct she alleges was unlawful according to substantive law existing at the time. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit Court of Appeals] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

Plaintiff states that George wanted Manning to terminate Rossi for the events that took place at the 2008 meeting. (P ¶ 323; D. Resp. ¶ 323). Although Plaintiff wrote in her comments on Rossi's grievance that the incident was the result of a "personality conflict" between Rossi and George, (P ¶ 316; D. Resp. ¶ 316), she now avers that she did not recommend that Rossi be disciplined because she did not believe Rossi did

28

anything wrong in the meeting and believed Rossi was justified in filing a grievance regarding the differential treatment that women were receiving, (P ¶ 317; D. Resp. ¶ 317). Rossi's grievance, however, included no reference to differential treatment; instead, she complained that George was "disrespectful," "verbally abusive," "made derogatory remarks," and was dismissive toward Rossi, her manager, and her coworkers during a department meeting. (Rossi Dep., Exh. 8 [Doc. 195-1 at 178]). The allegedly protected conduct Rossi engaged in during the meeting consisted of "question[ing] George regarding why women," and Plaintiff in particular, "were not receiving the same tools as men." (P ¶¶ 308-09; D. Resp. ¶¶ 308-09).

In an attempt to show that Rossi's complaint about unequal distribution of tools amounts to an adverse employment action and that Plaintiff therefore held a reasonable good faith belief that she was opposing employer conduct proscribed under Title VII, Plaintiff argues that the unequal distribution of tools amounted to impermissible discriminatory denial of a benefit or "privilege of employment" under Title VII as established in *Hishon v. King & Spalding*, 467 U.S. 69 (1984). [Doc. 211-1 at 10-14]. It is clear that this was not the case.

AO 72A
(Rev.8/8
2)

The Eleventh Circuit Court of Appeals has explained the law on adverse employment actions as follows:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling: the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

*Hishon* provides a weak analogy to Plaintiff's claims in this case. The Plaintiff in *Hishon* was an associate attorney passed over for partnership in her law firm and consequently terminated. *Hishon*, 467 U.S. at 72. The Court determined that the plaintiff had adequately stated a Title VII claim for discriminatory denial of privileges of employment based on allegations that "would support the conclusion that the opportunity to become a partner was part and parcel of an associate's status as an employee"—namely that the employer "used the prospect of ultimate partnership to

30

induce young lawyers to join the firm" and that it was known among the associates that they "could regularly expect to be considered for partnership at the end of their 'apprenticeships.' " *Id.* at 76. To analogize *Hishon* to the case at hand, the Court would have to find that the promise of receiving certain tools was a primary factor inducing employees to work for Defendant, such that it became "a term, condition, or privilege of . . . employment." *See id.* at 75-76.

Plaintiff proffers no facts to show that receipt of certain tools or equipment was so central to her own employment with Defendant or to any of the other women's employment. Plaintiff also does not specify what tools Rossi complained about, assert that women requested the tools and were denied them, or assert that the women lacked the tools necessary to do their work. Finally, Plaintiff does not cite any cases in which a court found that a plaintiff suffered an adverse employment action by not being "given" certain tools she did not show that she needed or requested. As a result, the undersigned finds that Plaintiff has failed to show that the unequal distribution of tools and equipment was an adverse employment action and that she therefore held an objectively reasonable belief that she was opposing conduct proscribed under Title VII when she refused to discipline Rossi after the 2008 meeting in question.

31

AO 72A
(Rev.8/8
2)

The undersigned therefore **RECOMMENDS** to the District Judge that he

**GRANT** summary judgment to Defendant on the retaliation claims arising from

Plaintiff's refusal to discipline Rossi after the 2008 incident with George.[11]

---

[11]     Because it presents a somewhat close question, in the event that the District Judge disagrees with this conclusion, the undersigned notes that if Plaintiff had shown evidence that she held an objectively reasonable belief that she was engaging in protected conduct, she has shown evidence sufficient to support a finding that the termination recommendation she received soon after she refused to reprimand Rossi was causally related to Manning's decision to give Plaintiff the choice to retire or be fired in July 2009.

Were Plaintiff to rely only on temporal proximity, this retaliation claim would fail. The October 2008 incident and the July 2009 termination did not happen in such close succession as to alone raise an inference of causation. The mortgage-fraud meeting and Plaintiff's refusal to reprimand Rossi for her conduct took place on October 10, 2008. It was on July 20, 2009—more than nine months later—that Manning gave Plaintiff the choice to retire or be terminated. This time distance alone would be too great to establish temporal proximity. *See Scalone v. Home Depot U.S.A., Inc.*, 280 Fed. Appx. 905, 909 (11th Cir. June 5, 2008) (finding gap of "approximately five months" time distance too remote to establish causation (citing *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.")); *Mathis v. Leggett & Platt*, 263 Fed. Appx. 9, 14-15 (11th Cir. Jan. 15, 2008) (finding no causation where "more than five months" elapsed between complaint and termination (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (finding three-and-a-half month gap "too remote to prove causation through temporal proximity")).

However, in its motion for summary judgment, Defendant argues that George's October 21, 2008, memo to Manning in which he recommended Plaintiff's termination is evidence that Defendant had legitimate nondiscriminatory reasons for terminating

32

### b.      *June 2009 Incident*

There are no temporal issues regarding the June 2009 incident and Plaintiff's termination. Indeed, the record shows that the two incidents were only about one month apart. *See Wideman*, 141 F.3d at 1457 (one month between protected conduct and adverse action sufficient to support inference of causation). The Court therefore turns to the question of whether Plaintiff has shown evidence that she had a reasonable belief that she was engaging in activity protected under Title VII when she refused to reprimand Rossi over the incident with Maxey.

Plaintiff relies on paragraphs 326 through 342 and 455 of her statements of material fact to support her assertion that her refusal to reprimand Rossi was protected activity. [Doc. 211-1 at 16]. Of those, the only statement mentioning discrimination is paragraph 455, in which Plaintiff states that she "believes that Maxey and Kirkpatrick wanted a woman to reprimand Rossi to avoid the appearance of gender discrimination, and this was part of the reason why [Plaintiff] initially refused to reprimand Rossi." (P ¶ 455 (citing Affidavit of Theresa McGruder ("Pl. Aff.") [Doc. 209] ¶ 120)). Defendant objects to the statement of material fact on the grounds that it "contradicts

_____

Plaintiff's employment. [*See* Doc. 161-2 at 13]. As a result, the undersigned finds that Defendant has waived any argument that George's memo is not causally linked to Plaintiff's termination.

AO 72A
(Rev.8/8
2)

the statements and allegations made in Plaintiffs' Amended Complaint in which she [Plaintiff] alleges that after signing the reprimand she 'later learned that Defendants' agents wanted a female to sign . . . Rossi's reprimand to avoid the appearance of discrimination." (D. Resp. ¶ 455 (citing Am. Compl. ¶¶ 104-05)). Defendant also argues that Plaintiff's deposition "negates" her "self-serving" affidavit testimony because "[d]uring her deposition, [Plaintiff] testified that she objected to Kirkpatrick's instructions to issue the reprimand to Rossi simply because she was not present during the encounter between Maxey and Rossi." [Doc. 220 at 14 & n.21 (citing Pl. Dep. at 127, 132-33, 183)].

A plaintiff cannot, over a defendant's well-taken objections, attempt to create an issue of fact by relying on her affidavit which contradicts her sworn deposition testimony. " 'When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' " *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (quoting *Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). As a result, a court may disregard the conflicting affidavit as a sham. *Rollins v. TechSouth, Inc.*, 833 F.2d

34

AO 72A
(Rev.8/8
2)

1525, 1530 (11th Cir. 1987). However, this rule is applied "sparingly" and only when there is an "inherent inconsistency" between the affidavit and the deposition testimony. *Id.*

Here, the undersigned need not determine whether the Court could strike the affidavit as a sham because, even accepting the affidavit testimony as true, it does not establish that Plaintiff engaged in protected activity. Plaintiff's claim relies on her alleged opposition to sex-based discrimination proscribed under Title VII. (*See* Am. Compl. ¶ 226 (alleging that Plaintiff refused to write up Rossi after learning that Defendant's management wanted her written up by a woman)). Plaintiff does not allege, however, that Defendant's management wanted to discipline Rossi in June 2009 for discriminatory reasons, nor does Plaintiff allege that the directive to reprimand Rossi was discriminatory toward Plaintiff or explain how wishing "to avoid the appearance of discrimination" otherwise violates Title VII. Consequently, Plaintiff has not proffered evidence showing that she engaged in conduct protected under Title VII.

The undersigned therefore finds that Plaintiff has failed to present evidence showing that she engaged in statutorily protected conduct when she resisted reprimanding Rossi in 2009. The undersigned therefore **RECOMMENDS** to the

AO 72A
(Rev.8/8
2)

District Judge that he **GRANT** Defendant's motion for summary judgment as to the retaliation claim arising from the 2009 incident.

## 2.    *Disparate Treatment*

Defendant also asserts that Plaintiff has not shown direct evidence of age or gender discrimination and cannot proffer circumstantial evidence sufficient to state a *prima facie* case of age or gender discrimination.  [Doc. 161-2 at 3-15].  As noted above, to state a disparate-treatment claim under Title VII based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown*, 401 Fed. Appx. at 479-80 (quoting *Maniccia*, 171 F.3d at 1368).  Similarly, a plaintiff establishes a *prima facie* case of age discrimination under the ADEA if she shows: "(1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir.

1999) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (citations omitted)).

Defendant does not challenge Plaintiff's membership in a protected class or question whether she was qualified to do her job. [Doc. 161-2, *passim*]. It does, however, argue that Plaintiff's disparate-treatment claims fail because there is no evidence that Plaintiff was subjected to an adverse employment action or that someone who was outside Plaintiff's protected gender class or who was substantially younger than Plaintiff was treated more favorably. [*Id*. at 5-7]. Defendant also appears to argue that Plaintiff was replaced not by Maxey but instead by Johnson, and that Johnson was not "substantially younger" than Plaintiff within the context of the ADEA. [*Id*. at 9].

Plaintiff, in response, contends that she was subjected to adverse employment actions and that Maxey and Brown are substantially younger males who were similarly situated to her and were treated more favorably. [Doc. 211-1 at 8]. Plaintiff avers that Defendant granted "privileges of employment" to Maxey and Brown but denied them to Plaintiff. [*Id*. at 11]. She complains that George never issued her a Blackberry; she did not receive a camera until 2009; she was not allowed to have her broken laptop replaced; she never received a Hewlett-Packard calculator; and she was "forced to drive a County car that she had to reserve." [*Id*.]. Plaintiff further avers that neither she nor

37

Poole were selected by George to attend out-of-state training opportunities; George allowed Maxey, Brown, Johnson, and another younger man subordinate to Poole to regularly disregard timeliness requirements but wrote up Plaintiff for violating a timeliness requirement a single time because she was at a work meeting with taxpayers; Plaintiff and Poole was "disparately treated with regard to input on staff changes, hiring, and promotion," with regard to attendance at Board of Assessor meetings, and with regard to George's general treatment; Plaintiff received a "biased performance appraisal" in 2008; and Plaintiff was forced to retire in 2009. [*Id*. at 12]. She further argues that after the forced retirement, she was replaced by Maxey, a substantially younger male, [*id*. at 14], and that the denial of equipment and other disparate treatment amounted to impermissible discriminatory denial of a benefit or "privilege of employment" under Title VII as established in *Hishon*, [*id*. at 10-14].

In reply, Defendant argues that Plaintiff's disparate-treatment claims are subject to summary judgment because none of the denials about which she complains—including her forced retirement—is sufficiently objectively serious or tangible to rise to the level of an "adverse employment action." [Doc. 220 at 2-5 & n.11]. It also alleges that Plaintiff never requested most of the things she now alleges she was denied. [*See id*. at nn.1-7]. It further contends that Plaintiff has not

38

shown that Maxey and Brown engaged in conduct similar to Plaintiff's and they therefore are not valid comparators. [*Id*. at 5-7].

### a. *Adverse Employment Actions*

Plaintiff contends that she suffered adverse employment actions when Defendant did not issue her a Blackberry, did not issue a camera to her until 2009, did not allow her to have her broken laptop replaced, did not issue her a Hewlett-Packard calculator, "forced" her to drive a County car that she had to reserve, did not select her to attend out-of-state training, wrote her up for being late for a taxpayer meeting, did not allow her input and failed to notify her regarding staff changes, did not allow her to attend Board of Assessor meetings, gave her a "biased" performance appraisal in 2008, allowed George to treat her poorly, and forced her to retire. [Doc. 211-1 at 11-14]. Defendant, in turn, argues that none of these actions were sufficiently objectively serious or tangible to rise to the level of an "adverse employment action," argues that Plaintiff never requested many of the things she now claims she was denied, and suggests that Plaintiff's retirement was voluntary and therefore not actionable. [Doc. 161-2 at 7-8 & n.2; Doc. 220 at 2-5 & nn.1-7].

AO 72A
(Rev.8/8
2)

### i. *"Poor Treatment"*

As an initial matter, it is well settled that general allegations of poor treatment are insufficient to show that a plaintiff suffered an adverse employment action. It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII [because] Title VII is not a 'general civility code.' " *Reeves v. C.H. Robinson Worldwide. Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Thus, Plaintiff's conclusory allegation that she was subject to an adverse employment action "with regard to how George treated her generally" is unavailing.

### ii. *Equipment and County Car*

As discussed above, Plaintiff relies exclusively on *Hishon* to support her allegations that the equipment and car issues constituted denial of "privileges of employment." [*See* Doc. 211-1 at 11-12 (citing *Hishon*, 467 U.S. at 75-76)]. The undersigned has already described why, to succeed under *Hishon*, Plaintiff would need to show that the promise of receiving the equipment Plaintiff desired or use of her personal car for business purposes was a primary factor inducing Plaintiff to work for Defendant, such that it became "a term, condition, or privilege of her employment." *See supra* Part IV.A.1.a.; *see also Davis*, 245 F.3d at 1239 (holding that to succeed in showing that an employer's conduct constituted an adverse employment action, the

AO 72A
(Rev.8/8
2)

plaintiff must show evidence that would allow a reasonable objective factfinder to determine that the employer's conduct impacted the " 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way" and caused "a *serious and material* change in the terms, conditions, or privileges of employment").

Plaintiff proffers no facts to show that receipt of equipment or use of her personal car was so central to her employment with Defendant. Additionally, Plaintiff admits that Blackberrys and laptops were not essential to the performance of her job duties. (P ¶¶ 50, 58). Plaintiff also states that she was assigned a laptop for use in the performance of her job duties and that the only repair it needed was replacement of a missing a key. (D ¶ 155; P. Resp. ¶ 155). Regarding the Hewlett-Packard calculators, she asserts only that they had "unique capabilities" and had "statistical functions that enabled the residential staff to compute value under the income approach with greater ease" and not that those calculators were essential to performance of her job. (P ¶ 90). She admits that she never requested a Blackberry, (D ¶ 159; P. Resp. ¶ 159); that during the two or three months she was not allowed to use her personal vehicle for work, she had access to a County car that she could reserve (although sometimes she had to book it a week in advance), (P ¶ 98; D. Resp. ¶ 98; D ¶¶ 180, 183; P. Resp. ¶¶ 180, 183); and that until she was issued a camera, she had access to one, (D ¶¶ 166-67; P. Resp.

41

¶¶ 166-67).   Plaintiff also admits that she never complained to George about not receiving tools that other employees received.  (D ¶ 177; P. Resp. ¶ 177).

Plaintiff also does not cite any cases in which a court found that a plaintiff provided with tools adequate to do her work suffered an adverse employment action by being denied certain tools she never requested or by being required to reserve a company car rather than being able to use her own vehicle for business purposes.  As a result, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** summary judgment to Defendant on the disparate-treatment claims arising from Defendant's refusal to provide Plaintiff with the equipment she desired or its refusal to allow her to use her personal car for business purposes for a period of two or three months.

### iii.    Attendance at Training and Board Meetings

Plaintiff also contends that she suffered adverse employment actions when she was not selected for out-of-state training and was not invited to Board of Assessor meetings.  [Doc. 211-1 at 12].  Plaintiff's allegations, taken as true, do not reasonably establish that these denials constituted adverse employment actions.

A denial of training that does not result in the loss of some tangible job benefit does not constitute an adverse action.   *McGuire v. Miami-Dade Cnty.*,

42

418 F. Supp. 2d 1354, 1360 (S.D. Fla. 2006); *Bullock v. Widnall*, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996) ("Although Bullock may very well have benefitted from attending [training] and it may have been insulting to have his subordinate chosen to attend, he has not demonstrated that his non-selection adversely affected the terms or conditions of his employment. . . . For instance, he has not shown that not attending the . . . training course would affect his salary, chances of promotion, ability to perform his job, etc. Consequently, the court is unable to conclude that the denial of training was an adverse employment action."); *Madiedo v. Miami-Dade Cnty.*, Case No. 99-1422, 2000 WL 1763845, at *4 (S.D. Fla. June 1, 2000) ("Generally, denial of training that does not cause the denial of a promotion, bonus, or other benefit does not constitute adverse employment action."); *see also Turlington*, 135 F.3d at 1436 n. 15 (stating in dicta that plaintiff must establish that defendant denied material training opportunities to him on the basis of age).

Plaintiff does not state that she was denied training altogether or that the out-of-state training she was prevented from attending resulted in the denial of a promotion, bonus, or other benefit, or that it had anything to do with her termination. Instead, she simply states that Maxey and Brown attended out-of-state training and conferences in Nevada and Texas, including a conference that Plaintiff and Poole had

43

attended in Georgia in 2007, and that Maxey and Brown "never shared any of the educational material they had received at the conferences with the female residential appraisal managers." (P ¶¶ 113-19). She also admits that she never asked Manning why she was not invited to attend the conferences in Nevada and Texas and that she never complained about not being invited to attend. (D ¶ 211; P. Resp. ¶ 211). She also admits that she was allowed to attend any continuing education courses mandated by the Georgia Department of Revenue. (D ¶ 212; P. Resp. ¶ 212). Because Plaintiff has not demonstrated that any alleged denial in training caused a "serious and material change in a term, condition or privilege in her employment," she has not established a *prima facie* case on this claim. *See Harvey v. City of Bradenton*, No. 804CV1748TEAJ, 2005 WL 3533155, at *5 (M.D. Fla. Dec. 22, 2005) ("Plaintiff does not provide any legal support for the proposition that denial of training requests can constitute an adverse employment action. This conduct . . . does not affect Plaintiff's salary, title, position, or job duties. Neither does Plaintiff present any evidence that the training denied was an important condition of employment.").

The Court also concludes that Plaintiff's claims of being excluded from bi-weekly Board of Assessors meetings does not amount to an adverse employment action as alleged by Plaintiff. Plaintiff alleges that prior to Manning's and George's

hiring, she was not a regular attendee at the Board of Assessors meetings but was allowed to attend the meetings in the absence of the former Deputy Chief Appraiser of the Residential Division. (D ¶¶ 138-39; P. Resp. ¶¶ 138-39). Although Plaintiff states that not attending the Board of Assessors meetings reduced her opportunities to interact with the Board and reduced her chances of being promoted, (P ¶¶ 262-63; D. Resp. ¶¶ 262-63), she admits that she never asked Manning for permission to attend Board of Assessor meetings, (D ¶ 140; P. Resp. ¶ 140), and never states that she was forbidden to attend the meetings, (P ¶ 258 (noting that Poole inferred that she and Plaintiff were not welcome at the meetings)). She has also failed to produce any evidence that her failure to be included on those meetings impacted her ability to do her job, had anything to do with her termination, or changed her job duties. Without such evidence, Plaintiff cannot show that she suffered an adverse employment action as a result of not being invited to the meetings. *See Rogers-Libert v. Miami-Dade Cnty.*, 184 F. Supp. 2d 1273, 1285-86 (S.D. Fla. 2001) (finding that plaintiff's exclusion from meetings was not an adverse employment action because she suffered no "loss in salary or benefits, subsequent denial of promotions, workplace reassignment, transfer or change in her permanent job title.").

AO 72A
(Rev.8/8
2)

### iv. *Involvement in Personnel Decisions*

Plaintiff also contends that she "was disparately treated with regard to input on staff changes, hiring, and promotion." [Doc. 211-1 at 12]. She states that George would transfer Poole's and Plaintiff's staff members without giving them any prior notice or seeking their input, (P ¶¶ 224, 230-31; D. Resp. ¶¶ 224, 230-31), and that there were times that Maxey and Brown knew of changes that were going to be made to Poole's or Plaintiff's staff before Poole or Plaintiff knew about the changes, (P ¶ 225-27, 234-35; D. Resp. ¶ 225-27, 234-35). Plaintiff also indicates that prior to George joining the Assessor's Office in 2006, Plaintiff was "always a member of the hiring and promotion panels," but that after George joined the office, "only the guys"—Maxey and Brown—participated in the panels. (P ¶¶ 242, 245; D. Resp. ¶¶ 242, 245).

Once again, Plaintiff has not proffered any cases showing that these employer actions, even if true, constituted an adverse employment action. Nor has she raised any argument that making staffing decisions and participating in hiring and promotion panels had been a significant portion of her responsibilities prior to George joining the office. Consequently, Plaintiff's allegations are insufficient to establish that she suffered an adverse employment action. Again, to constitute an adverse employment

action, the employer's action must severe and material and is judged objectively from the view of a reasonable employee. *Davis*, 245 F.3d at 1239. "An employment action [] is not adverse merely because the employee dislikes it or disagrees with it." *Collier v. Clayton Cnty. Cmty. Serv. Bd.*, 236 F. Supp. 2d 1345, 1378 (N.D. Ga. 2002) (Carnes, J.) (finding that, where there was no reduction in pay or title, reduction in plaintiff's supervisory responsibility from approximately 280 employees to ten did not constitute adverse employment action). *Compare Robertson v. Ala. Dep't of Econ. & Cmty. Affairs*, 902 F. Supp. 1473, 1481 (M.D. Ala. 1995) (finding genuine issue of material fact as to adverse action where defendant transferred plaintiff from office building to warehouse, moved her from supervisory position to one with no subordinates, substantially increased her workload, and changed her performance evaluation from high marks to "meets standards" when she fell behind). Without additional context, no reasonable factfinder could determine that Plaintiff suffered a reduction her job responsibilities so significant as to be considered a serious and material change in her employment.

### v. *Performance Evaluations and "Write-Ups"*

Plaintiff also alleges that she suffered adverse employment actions when George wrote her up on the single occasion that she was late for a meeting, [Doc. 211-1 at 12

47

(citing P ¶¶ 163-71)], and gave her a "biased" performance evaluation in 2008, [Doc. 211-1 at 13 (citing P ¶¶ 148-57, 208-23)]. A written reprimand will not constitute an adverse employment action unless it leads "to [a] tangible harm in the form of lost pay or benefits." *Wallace v. Ga. Dep't of Transp.*, 212 Fed. Appx. 799, 801 (11th Cir. Dec. 13, 2006). There is no allegation that the reprimand for untimeliness had any effect on Plaintiff's pay or benefits, or that it had any repercussions at all. (*See* P ¶¶ 163-71). As a result, Plaintiff cannot show that she was subject to an adverse employment action as a result of the 2008 written reprimand for tardiness to a taxpayer meeting.

In contrast, Plaintiff alleges that there is evidence that Manning used George's 2008 performance appraisal as part of his justification for ending Plaintiff's employment. [Doc. 211-1 at 13 (citing P ¶ 398)]. The statement of material fact Plaintiff cites states that "Manning further alleges that 'the sales ratios' would confirm that Poole and Plaintiff were 'chasing sales.' " (P ¶ 398). The undersigned is at a loss to understand how this statement shows that Manning relied on the 2008 performance appraisal when deciding to end Plaintiff's employment.

In its motion for summary judgment, however, Defendant argues that the 2008 performance appraisal George issued Plaintiff is evidence that Defendant had legitimate

48

nondiscriminatory reasons for terminating Plaintiff's employment. [*See* Doc. 161-2 at 13]. The Eleventh Circuit has held that there must be "evidence that asserted reasons for discharge were actually relied on or the reasons are not sufficient to meet defendant's rebuttal burden." *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (quoting *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 775 (11th Cir. 1982)). As a result, the undersigned finds that Defendant has waived any argument that the performance appraisal is not causally linked to Plaintiff's termination, and consequently, that the 2008 performance appraisal did not constitute an adverse employment action.

### vi. Forced Retirement

Defendant also suggests that Plaintiff voluntarily retired and therefore cannot claim that she suffered an adverse employment action. [Doc. 161-2 at 7-8 (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995))]. Plaintiff, in response, argues that *Hargray* does not apply because Plaintiff did not have a property interest in her employment and because she had no choice regarding her termination: Defendant clearly intended to dispense with her services. [Doc. 211-1 at 15 (citing *Andazola v. Logan's Roadhouse, Inc.*, 871 F. Supp. 2d 1186, 1207-09 (N.D. Ala. 2012))].

49

AO 72A
(Rev.8/8
2)

Even under the assumption that *Hargray* applies, the undersigned finds that Plaintiff has the better end of this argument. "An employee's resignation will be deemed involuntary where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (per curiam); *see also Ross v. City of Perry*, 396 Fed. Appx. 668, 670 (11th Cir. Sept. 22, 2010) (reviewing factors outlined in *Hargray* to determine plaintiff was not coerced into resigning). In the Eleventh Circuit, the following factors guide a court's determination of whether a resignation was obtained by coercion or duress:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Hargray*, 57 F.3d at 1568. In *Hargray*, wherein the court found that the plaintiff had voluntarily resigned, the plaintiff had the opportunity to fight the criminal charges against him or choose to resign, and the plaintiff chose the latter. *Id*. at 1570. In *Ross*, the plaintiff was likewise given the opportunity to defend himself against the

AO 72A
(Rev.8/8
2)

accusations raised against him and instead chose to resign. *Ross*, 396 Fed. Appx. at 670.

Here, in contrast, Plaintiff was not accused of any misconduct but instead was simply told by Manning that he was moving in a different direction and that her services were no longer needed. (D ¶ 107; P. Resp. ¶ 107). Plaintiff was presented only with the option of retiring or being terminated and losing her pension benefits. (D ¶¶ 108-09; P. Resp. ¶¶ 108-09). There were no accusations to fight, and no choice that could result in her continued employment. As a result, the undersigned finds that Plaintiff's resignation was coerced and tendered under duress. Further underscoring the coercive nature of Plaintiff's alleged "choice" to resign is the evidence that when Poole was given the same options, she did not agree to retire and was nevertheless officially terminated three days after Plaintiff's "resignation" was official. (P ¶ 286; D. Resp. ¶ 286; Poole Dep., Exh. 14 [Doc. 191-1 at 33]). Consequently, the undersigned finds that there was nothing voluntary about Plaintiff's retirement.

### vii.    Summary

For all of these reasons, the undersigned finds that Plaintiff suffered an adverse employment action when she was presented with the choice to retire or be terminated and finds that Defendant waived its argument that the subpar performance appraisal

51

George issued Plaintiff in 2008 did not constitute an adverse employment action. The undersigned does not find, however, that any of the other conduct Plaintiff alleges was sufficiently objectively serious or tangible to constitute an adverse employment action. The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** summary judgment to Defendant on all of Plaintiff's disparate-treatment claims except for those arising from her forced resignation and the 2008 performance appraisal.

### b. Comparators

Having determined that two of the adverse employment actions Plaintiff alleges should survive Defendant's motion for summary judgment, the undersigned now turns to Defendant's challenge to Plaintiff's comparators. The undersigned first addresses the termination claim and then addresses the performance-evaluation claim.

### i. Replacement with a "Substantially Younger" Employee

Defendant does not challenge Plaintiff's allegation that her position was filled by a male, but it does contend that Plaintiff cannot show that she was replaced by an employee who was substantially younger. [Doc. 161-2 at 8-9]. In support of the argument, Defendant explains that each employment position in Fulton County is assigned a unique position identification number, (D ¶ 116; P. Resp. ¶ 116). [Doc. 161-

2 at 9]. That unique number corresponds to and identifies the position for personnel tracking purposes, (D ¶ 116; P. Resp. ¶ 116). [Doc. 161-2 at 9]. Defendant also shows that as of her retirement date, Plaintiff held position number 0011100, (D ¶ 117; P. Resp. ¶ 117), and that in or around January 2010, Johnson was promoted into the position identified as position number 0011100, (D ¶ 118; P. Resp. ¶ 118), and assigned to the 17th District, (D ¶ 119; P. Resp. ¶ 119), and Maxey was assigned to 14th District, (D ¶ 120; P. Resp. ¶ 120). [Doc. 161-2 at 9]. Although the argument is not entirely clear, it appears that Defendant is contending that this shows that when Plaintiff retired, she was replaced by Johnson rather than Maxey and therefore was not replaced by a "substantially younger" person. [*See* Doc. 161-2 at 9].

The undersigned finds this argument unconvincing for two reasons. First, it is unclear why Fulton County's internal tracking system would have any relevance to Plaintiff's discriminatory-termination claims. The claims arise from Plaintiff's termination from the Appraisal Manager position in the 14th District; regardless of whether Maxey or Johnson was then assigned the "unique position identification number" Plaintiff had held, the facts at this stage of the case show that upon Plaintiff's retirement, Maxey was transferred to fill the Appraisal Manager opening in the 14th District, (D ¶ 115; P. Resp. ¶ 115). Making all reasonable inferences in Plaintiff's

53

favor, as the Court must on a motion for summary judgment, the undersigned finds that these facts are sufficient to enable a reasonable factfinder to determine that Maxey replaced Plaintiff after she was terminated from the Appraisal Manager position in the 14th District. Defendant's argument includes no citations to law and does not proffer any other reason Plaintiff should not enjoy this legal presumption. [*See* Doc. 161-2 at 8-9].

Second, even if the position identification numbers did have some legal effect, the facts Defendant proffers do not show that Plaintiff was not replaced by a "substantially younger" person. To succeed on an ADEA claim, the plaintiff must show that she was replaced by someone "substantially younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Plaintiff was born on August 4, 1953, (D ¶ 2; P. Resp. ¶ 2), and Johnson was born on September 13, 1963, (Johnson Aff. [Doc. 177] ¶ 2); thus, Plaintiff is approximately ten years and one month older than Johnson.

It appears that Defendant is proceeding on the theory that a person within the plaintiff's protected age class cannot, as a matter of law, be considered "substantially younger" for the purposes of the ADEA. [*See* Doc. 161-2 at 8-10]. This is not true. *See O'Connor*, 517 U.S. 308, 313 (holding that "replacement by someone outside the

protected class" is not a proper element of a *prima facie* case under the ADEA and that whether one person lost out to another in the protected class is "irrelevant, so long as he has lost out because of his age") (italics omitted). Indeed, the Eleventh Circuit has found that a plaintiff showing that she was replaced by a person who was more than forty years old and only four years younger than she had presented a *prima facie* case of age discrimination under *McDonnell Douglas*. *Carter v. City of Miami*, 870 F.2d 578, 583 (11th Cir. 1989) (noting that "age is a continuum along which the distinctions between employees are often subtle and relative" and finding that replacement of a fifty-year-old with a forty-six-year-old was sufficient to establish a *prima facie* case of age discrimination) (internal quotation marks omitted). Given this precedent, the undersigned cannot recommend granting any portion of Defendant's motion for judgment on the ground that Johnson was not "substantially younger" than Plaintiff within the context of an ADEA claim.

For all of these reasons, the undersigned concludes that Defendant has failed to show on summary judgment that Plaintiff cannot establish a *prima facie* case of disparate treatment with regard to her termination claims under Title VII or the ADEA.

AO 72A
(Rev.8/8
2)

### ii. 2008 Performance Evaluation

Although Defendant does not specifically address the 2008 performance evaluation in its motion for summary judgment other than to argue that it is evidence that it had legitimate nondiscriminatory reasons for terminating Plaintiff's employment, Defendant does generally contend that Plaintiff cannot show a similarly situated comparator who was treated more favorably. [Doc. 161-2 at 7]. Plaintiff, in response, argues that there is "ample evidence" in the record to support an inference that age and gender bias motivated her 2008 Performance Appraisal score. [Doc. 211-1 at 13-14, 20 (citing P ¶¶ 148-57, 208-23)]. Plaintiff explains that in July or August of 2008, Poole gave two young male subordinates low performance appraisal ratings for the review period of November 2007 through June 2008—Johnson received a performance appraisal rating of 1.5 ("Fair (but Needs Improvement))" and Mo Davis received a rating of 2.0. (P ¶¶ 148, 157; D. Resp. ¶¶ 148, 157). When George found out about the scores, he remarked that he could not believe Poole "had the nerve" to give someone a 1.5 or 2.0 review score. (P ¶¶ 154, 159; D. Resp. ¶¶ 154, 159). He then issued to Plaintiff a performance appraisal rating of 1.6 ("Fair (but Needs Improvement))," (D ¶ 101; P ¶ 101), and to Poole a performance appraisal rating of 1.5. (P ¶¶ 210, 212; D. Resp. ¶¶ 210, 212). He left blank the "performance summary" section that called

56

for "the reason for the employee's overall rating, including any strengths or weaknesses that are pertinent to the appraisal." (P ¶¶ 216-17; D. Resp. ¶¶ 216-17). Plaintiff then alleges, without citing any evidence, that "Maxey and Brown never were subject to such treatment." [Doc. 211-1 at 14].

While the evidence that Plaintiff presents carries the clear implication that Plaintiff's and Poole's performance appraisal ratings were bogus, it does not show that George issued Plaintiff and Poole bogus ratings because they were members of a protected class. For a plaintiff to prevail under Title VII, the evidence must allow a reasonable factfinder to determine that gender was a "motivating factor" in bringing about the challenged adverse employment action, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009), and under the ADEA, she must show that age was the "but-for" cause for the challenged adverse employment action, *id.* at 180. Here, Plaintiff presents no evidence showing that young or male employees were exempt from such treatment or even that Maxey and Brown did not receive comparable performance evaluations. [*See* Doc. 211-1 at 14]. Thus, the evidence Plaintiff presents is simply too conclusory to allow a reasonable factfinder to determine that George issued the low scores *because of* Plaintiff's and Poole's gender or age.

57

AO 72A
(Rev.8/8
2)

The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment on the disparate-treatment claims arising from the 2008 performance review George issued to Plaintiff.

### B.     Pretext

Defendant also argues that it had legitimate nondiscriminatory reasons for Plaintiff's termination and that there is no evidence Plaintiff can present to show that the reasons were pretextual. [Doc. 161-2 at 11-14]. Plaintiff, in turn, contends that Defendant's evidence is insignificant and that, in any case, she can show abundant evidence of pretext.

Under the *McDonnell-Douglas* framework, if a plaintiff establishes a *prima facie* case, she has created an inference of discrimination, and the defendant has the burden of articulating a legitimate, non-discriminatory reason for its employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). This burden is "exceedingly light." *Holifield*, 115 F.3d at 1564. "[T]he defendant must merely proffer non-[discriminatory] based reasons, not prove them." *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994). That is, the employer must only introduce admissible evidence to support the challenged employment actions. *Burdine*, 450 U.S. at 254-55. "Although this burden is not onerous, . . . neither is it a mere formality."

58

*Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting *Burdine*, 450 U.S. at 253). At this stage, a defendant-employer must:

> clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant.

*Id*. (quoting *Burdine*, 450 U.S. at 253). As previously noted, to meet its rebuttal burden in this circuit, the defendant must also proffer "evidence that asserted reasons for discharge were actually relied on." *IMPACT*, 893 F.2d at 1194.

If the defendant meets this light burden, then the inference of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Brooks*, 446 F.3d at 1162 (quoting *Joe's Stone Crabs, Inc*., 296 F.3d at 1272); *Holifield*, 115 F.3d at 1565. Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson*, 376 F.3d at 1088 (quoting *Burdine*, 450 U.S. at 253).

Interestingly, despite the reason Manning gave Plaintiff at the time she was dismissed, the reasons Defendant now proffers for terminating Plaintiff's employment are less about showing that Plaintiff's services did not fit into Manning's "new

59

direction" and more about implying that Plaintiff was fired because her performance was lacking—particularly according to George.

Defendant first presents myriad reasons for George's desire to terminate Plaintiff's employment. He states in deposition testimony that he had concerns about Plaintiff's performance, including her processing of work and her handling of the mortgage fraud prevalent in the 14th District. (D ¶ 95). He also testified that he had concerns about lengthy delays in Plaintiff's preparation of settlement and assessment memos and her getting new construction on the books. (D ¶ 96). He further stated that he addressed his concerns with Plaintiff and instructed her to revaluate properties in her district, but she never did. (D ¶¶ 97-98). As previously noted, Defendant also points to the 2008 performance appraisal in which George rated Plaintiff at 1.6 out of a possible 3, and to the October 21, 2008, interoffice memo in which George recommended to Manning that Plaintiff's employment be terminated for failure to address mortgage fraud in her district and for failure to apply proper appraisal standards. [Doc. 161-2 at 13].

Defendant also notes Kirkpatrick's testimony that when he first took over the division, he had "some issues with some of the things that had been done in the 14th District concerning properties which had sold in the last few years," that he

believed that "an illegal practice known as price chasing had been practiced, and that he "had some discussions concerning that with [his] managers." (D ¶ 81). And finally, it points to Manning's deposition testimony in which he states that he decided to terminate Plaintiff because "there were places where gross errors in judgment were made in my opinion" and that even after he discussed mortgage-fraud and sales-chasing issues with Plaintiff, she failed to establish control of the sales chasing[12] and mortgage fraud occurring in the 14th District.  (D ¶¶ 111-12).[13]

---

[12]    "Price chasing" or "sales chasing" does not have a standard definition. Plaintiff and Defendant appear to agree with Maxey's description:

> My understanding is that chasing sales [is] where we've had properties that have sold for these exorbitant amounts in neighborhoods from a cost standpoint, you know, the wood, the mortar, the plumbing does not add up to what this exorbitant amount of sale price is.  And . . . in our sales ratio analysis where we monitor and weigh how values are determined for that given year, if you are to raise a value on a property to come within the percentage range that the Department of Revenue mandates for their sales ratio analysis to be approved, then that's considered sales chasing.

(D ¶ 83; P. Resp. ¶ 83).

[13]    Defendant also cites deposition testimony from Maxey stating that the Board of Assessors expressed concern about the valuation of properties in the 14th District. [Doc. 161-2 at 12 (referring to D ¶ 94)]. Plaintiff objects to the statement as inadmissible hearsay.  (P. Resp. ¶ 94).  Because there is no indication in any of the filings that Maxey was a decisionmaker or had any influence on the decision to terminate Plaintiff's employment, the undersigned presumes that the statement is offered for the truth of the matter asserted. Consequently, Plaintiff's hearsay objection

AO 72A
(Rev.8/8
2)

Although the proffered reasons are a departure from Manning's contemporaneous statement that Plaintiff's employment was being terminated because the office was going in a "new direction," the Court finds that this evidence is nevertheless sufficient to meet Defendant's light burden of production of evidence showing legitimate nondiscriminatory reasons for Plaintiff's termination. The burden therefore returns to Plaintiff to establish that (or at this stage at least show a genuine issue of material fact as to whether) Defendant's articulated reasons for her termination are pretextual. Plaintiff's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). If, however, "the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024-25 (emphasis added).

In her response brief, Plaintiff both questions the credibility of Defendant's proffered reasons for her termination and argues that the evidence shows that Defendant

_____

is **SUSTAINED**.

62

more likely than not acted with a discriminatory motive. [Doc. 211-1 at 17-22 (citing P ¶¶ 299-325, 343-455)]. With regard to the credibility of Defendant's proffered reasons for her dismissal, Plaintiff first asserts that "in an employment environment where housing data and managerial decisions were extensively documented and reported on," it is "strange" that George's 2008 memo recommending Plaintiff's termination is Defendant's only documentary evidence alleging specific work deficiencies. [*Id.* at 18]. Second, she states that in all of her time at the Assessor's Office, she was written up only one other time—for the late arrival at the taxpayer meeting—and received only one unsatisfactory performance appraisal—the one issued to her in 2008 by George that did not contain any explanation for the low score. (P ¶¶ 358, 360-61; Pl. Aff. ¶ 113). Third, she points to Manning's testimony that it was not uncommon for George to write people up without good grounds to do so. (P ¶ 359; Manning Dep. at 66). Fourth, Plaintiff notes that she was active in her efforts to train her appraisers with regard to proper appraisal theory and valuation methodology, especially when it came to mortgage fraud; that her appraisers were proficient at spotting mortgage fraud "long before 2008"; that she "strictly forbade her staff from chasing sales"; and that Rossi, who worked for Plaintiff, conducted extensive research and analysis on mortgage fraud in 2007. (P ¶¶ 305, 367-68; D. Resp. ¶¶ 305, 367-68).

AO 72A
(Rev.8/8
2)

Fifth, Plaintiff presents testimony that the real estate market started falling in 2008, leading to the reasonable inference that sales chasing became a non-issue well before the date of Plaintiff's termination. (P ¶ 417 (Kirkpatrick Dep. at 60)). Sixth, Plaintiff points out that neither Manning, George, Kirkpatrick, nor any other superior told her of a deficiency in her performance or told her that her job was in jeopardy if she failed to improve her performance. (P ¶¶ 427-28, 445; D. Resp. ¶¶ 427-28, 445). Seventh, she testifies that she always got her reports done in a timely fashion and was never written up for delays in work performance. (P ¶¶ 430, 436; D. Resp. ¶¶ 436; Pl. Aff. ¶ 106). Eighth, Plaintiff testifies that she was always well-prepared for staff meetings and provided quantitative data when necessary. (P ¶ 441; Pl. Aff. ¶¶ 61-62). Ninth, she points out that no one at the Assessor's Office ever mentioned anything regarding Plaintiff's job performance being substandard or poor. (P ¶ 453; D. Resp. ¶ 453). The Court also notes that at the time of Plaintiff's termination Manning did not state that Plaintiff was being fired for failing to adequately perform her job duties, chasing sales, or improperly handling cases of mortgage fraud, but instead told her that her services were no longer needed because the Assessor's Office was "moving in a new direction." (D ¶ 107; P. Resp. ¶ 107).

AO 72A
(Rev.8/8
2)

With regard to evidence that Defendant acted with discriminatory motive, Plaintiff first points to Poole's deposition testimony that during one staff meeting, George emphasized that even though some people had been at the Assessor's Office for a long time, those people should not "get used to it" because they would not be there much longer. (P ¶ 446; D. Resp. ¶ 446). Second, she points to the fact that George wrote her up for missing one meeting with a taxpayer because she was attending a meeting with several taxpayers, but George did not reprimand Maxey, Brown, Davis, or Johnson for long lunches or failing to return to the office when they were supposed to. (P ¶¶ 138, 140, 143-45; D. Resp. ¶¶ 138, 140, 143-45; Poole Dep. at 70). Third, she points to the fact that George did not give her the same tools, training, and opportunity to attend high-level meetings that he gave to Maxey and Brown. [Doc. 211-1 at 20 (*see, e.g.,* P ¶¶ 92 (Hewlett-Packard calculators), 118 (out-of-state training), 242 (participation in hiring panel); D ¶¶ 92, 118, 242; Deposition of Timothy Brown [Doc. 231-1] at 101, 103 (stating that he had a county car available to him from 2006 through 2009 and that Maxey had one as well); Pl. Dep. at 117 (stating that Plaintiff had to reserve a shared County car)]. Fourth, she states that "the record is bereft of any evidence indicating that Manning conducted an independent investigation into the

65

allegations contained within George's 2008 termination memo."[14] [Doc. 211-1 at 21]. It also bears noting that Poole, also female and more than forty years old, was terminated on the same day as Plaintiff and also because the office was "moving in a new direction." (P ¶¶ 282-84, 286; D. Resp. ¶¶ 282-84, 286).

In reply, Defendant characterizes Plaintiff's evidence as "unsupported" and "self-serving," contends that Plaintiff is essentially urging the Court to second-guess Defendant's business decision to terminate her employment, and argues that Plaintiff's contentions rest on her own perception of her performance. [Doc. 220 at 9-10]. Defendant also asserts—without citing any statements of material fact or evidence—that it is "undisputed" that Manning did not rely on George's termination memo in making his decision to terminate Plaintiff's employment. [*Id*. at 11].

On the contrary, the Court finds that Plaintiff met Defendant's reasons for her termination and directly rebutted them not with unsupported self-serving testimony regarding her own perception of her performance but instead to objective statements of fact regarding her disciplinary history and performance-review record, undisputed

---

[14]     Plaintiff also avers that Manning testified that he relied in part on the 2008 performance appraisal in his decision to terminate Plaintiff's employment. [Doc. 211-1 at 20-21 (citing P ¶ 398)]. The Court finds that both the statement of material fact and the deposition testimony supporting it do not support this allegation. The Court therefore disregards it.

AO 72A
(Rev.8/8
2)

statements regarding the activities she undertook to address issues of mortgage fraud and sales-chasing, and to testimony taken in deposition. Additionally, as the undersigned has already noted, Defendant itself argues that George's termination memo is evidence that Defendant had legitimate nondiscriminatory reasons for firing Plaintiff, thereby implying that Manning—the decisionmaker—relied at least in part upon the memo in making the decision to fire Plaintiff. *See IMPACT*, 893 F.2d at 1194 (requiring that there must be "evidence that asserted reasons for discharge were actually relied on or the reasons are not sufficient to meet defendant's rebuttal burden").

Importantly, Defendant does not reply with evidence showing any independent basis for Manning's determination that Plaintiff was not properly addressing mortgage fraud or was chasing sales. [*See* Doc. 220 at 11]. Instead, it points to Manning's testimony that he had a conversation with her about mortgage fraud and chasing sales and that Plaintiff "did not change [her] ways" or "improve [her] appraisals." [*Id*. at 11-12]. This provides no grounds for finding that Manning came to this conclusion independent of George's influence.

In short, the undersigned recommends that Defendant's summary judgment motion be denied as to Plaintiff's termination because the reasons proffered for her termination now (poor performance) are different than the one stated at the time of her

67

forced resignation (moving in a different direction), and the reasons Defendant proffers for her poor performance are criticisms made by a non-decisionmaker (George) and not by the decisionmaker (Manning) or as a result of the decisionmaker's independent assessment of Plaintiff's performance.

Accordingly, the undersigned finds that Plaintiff has proffered evidence sufficient to allow a reasonable factfinder to determine that George acted with discriminatory animus, that Manning acted on information George provided that was tainted by discriminatory animus, and that Defendant's proffered reasons for the termination of Plaintiff's employment were not true.[15]  *See Clark*, 990 F.2d at 1228 (noting that a plaintiff may avoid summary judgment by presenting probative evidence showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

---

[15]     Although Defendant does not point to the evidence, it bears noting that Plaintiff alleged as an undisputed material fact that "Manning further alleges that 'the sales ratios' would confirm that Poole and [Plaintiff] were 'chasing sales.' " (P ¶ 398 (citing Manning Dep. at 161)).  On the face of the statement, this appears to support an inference that Manning independently corroborated George's opinion regarding "sales chasing."  However, because the statement is not particularly clear (in particular, it is not clear how sales ratios resulting from sales chasing would be different from sales ratios resulting from a falling housing market or—more importantly—that Manning relied on sales ratios when he made the decision to end Plaintiff's employment) and Defendant does not rely on the statement as evidence showing that Plaintiff was terminated for a legitimate non-discriminatory reason, the undersigned finds that the statement to be insufficient to overcome Plaintiff's showing of pretext.

in the employer's proffered legitimate reasons for its action"). Thus, Plaintiff has raised a genuine issue of material fact as to whether Defendant's proffered nondiscriminatory reasons for her termination are pretextual. The undersigned therefore **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment on the disparate-treatment claims arising from Plaintiff's termination.

## V. Conclusion

For the reasons set forth above, the undersigned **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment as to the disparate-treatment claims arising from Plaintiff's termination and **GRANT** the motion for summary judgment on all of the remaining claims. [Doc. 161]. Reports and Recommendations on the remaining pending summary-judgment motions will be forthcoming under separate cover.

**IT IS SO RECOMMENDED**, this the 31st day of January, 2013.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)