# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| LEANN ROSSI, THERESA MCGRUDER, ANSLEY PASCOLI, DEBRA POOLE, CHERYL SMALLS, and REBECCA CANADA, | : : : : | |
| | : | CIVIL ACTION FILE NO. |
| Plaintiffs, | : | 1:10-CV-4254-RWS-AJB |
| | : | |
| v. | : | |
| | : | |
| FULTON COUNTY, GEORGIA, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND NON-FINAL REPORT AND RECOMMENDATION

In this action, Plaintiff Debra Poole raises employment-discrimination claims against Defendant Fulton County, Georgia, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Am. Compl. [Doc. 16]). Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Debra Poole. [Doc. 162]. For the reasons set forth below, the undersigned **RECOMMENDS** that the motion be **GRANTED IN PART and DENIED IN PART**.

## I.    Background

As required when considering a motion for summary judgment, the Court has

viewed the evidence and reasonable factual inferences in the light most favorable to

Plaintiff, the nonmoving party.[1]  *See United States v. Four Parcels of Real Prop*.,

941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  To the extent that material facts are in

dispute, the Court has resolved the disputes in Plaintiff's favor.[2]  *See Vaughan v. Cox,*

---

[1]      Paragraph numbers preceded by "D" refer to Defendant's Statement of Material Facts, as to Plaintiff Debra Poole, to Which There Are No Genuine Issues To Be Tried, filed in support of its motion for summary judgment, [Doc. 162-1], and paragraph numbers preceded by "P" refer to Plaintiff Debra Poole's Additional Statement of Material Facts Which Present a Genuine Issue for Trial, [Doc. 212-3], filed in opposition to Defendant's motion for summary judgment.  Plaintiff's and Defendant's responses to the statements of material fact will be designated as "P. Resp.," [Doc. 212-2], and "D. Resp.," [Doc. 222-1], respectively.

[2]      The Court notes that for the purposes of resolving a motion for summary judgment, "facts" may not be considered unless they are unopposed or supported by citations to admissible evidence.  *See* Fed. R. Civ. P. 56(c); LR 56.1(B).  For this reason, when the opposing party has pointed out that the evidence cited to support a factual statement is unsupportive, the Court has edited the fact to recite only the portion supported by the evidence, and in cases in which the citation is absent or unsupportive, the Court has omitted the statement of fact entirely.  (*See, e.g.,* P ¶¶ 175, 201, 228, 230, 234, 275, 303, 355, 364, 374, 396-97, 400, 411-13, 416, 419, 421-23, 440; D ¶¶ 106, 124, 138).

The Court also recognizes that Plaintiff has objected to Defendant's reliance on an affidavit submitted by Henry Brigham because, Plaintiff contends, Defendant did not list Brigham as a potential witness on its Amended Response to Initial Disclosures.  (*See, e.g.,* P. Resp. ¶ 80 citing [Doc. 150 at 10-12] and Fed. R. Civ. P. 37(c)(1)).  It does

AO 72A
(Rev.8/8
2)

343 F.3d 1323, 1326 n.1 (11th Cir. 2003). The Court does not, however, accept legal

conclusions, masquerading as facts, as true. *See Day v. Taylor*, 400 F.3d 1272, 1277

(11th Cir. 2005). The facts of the case, for the purpose of adjudicating Defendant's

motion for summary judgment, are therefore as follows.[3]

Plaintiff, who was born on May 25, 1956, is a female over forty years of age.

(D ¶¶1-2; P. Resp. ¶¶ 1-2). She became employed with Defendant in or around October

---

appear that Defendant failed to disclose Brigham. [*See* Doc. 25 at 7; Doc. 150 at 10-12]. Consequently, the objections as to Brigham are **SUSTAINED**, and the Court therefore disregards any portion of Defendant's statements of fact to which Plaintiff objected and that rely on Brigham's testimony.

[3] The Court notes that between the two parties' statements of material fact, 725 factual statements are presently before the Court. [*See* Docs. 162-1, 212-3]. Given this volume, it is not surprising that many of the statements are repetitive or only tangentially related to the claims Plaintiff raises. Thus, a significant number of the statements need not—and will not—be recited in this Report and Recommendation. The facts recited in this section are intended to establish the context of the case. Additional facts pertinent to the parties' arguments will also be recited in the discussion section below. Statements of fact that have no apparent materiality and are not referenced in the parties' arguments have not been included. *Cf. Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (refusing to supply argument for party).

The Court also advises counsel that the Local Rules direct parties to submit in conjunction with a summary judgment motion or opposition thereto a ". . . concise . . . statement of material facts . . . ." LR 56.1.B(1), (2)(b), NDGa. What this means, and what better serves the Court in resolving disputes, is that the statement of material facts be reasonable and not contain every fact revealed through the extensive discovery process.

AO 72A
(Rev.8/8
2)

1991 as an Appraiser I in the Standards Division in the Tax Assessor's Office. (D ¶¶ 3-4; P. Resp. ¶¶ 3-4). Plaintiff was promoted to the position of Appraiser II in or around 1993. (D ¶ 5; P. Resp. ¶ 5). As an Appraiser II, Plaintiff batched work, reviewed data collection work, and entered data into the computer system. (D ¶ 6; P. Resp. ¶ 6). She was also responsible for supervising and directing the work of a group of data collectors. (D ¶ 7; P. Resp. ¶ 7).

Plaintiff was promoted to the position of Senior Appraiser in or around 1998. (D ¶ 8; P. Resp. ¶ 8). In her role as Senior Appraiser, Plaintiff assisted an appraisal manager with the day-to-day activities of an appraisal staff of ten to thirteen employees, including assigning work, verifying the work of the staff, and monitoring and coordinating their work activities. (D ¶ 9; P. Resp. ¶ 9).

Plaintiff was promoted to the position of Appraisal Manager on August 15, 2001. (D ¶ 10; P. Resp. ¶ 10). Plaintiff's duties as an Appraisal Manager included supervising, training, and managing the day-to-day operations of an appraisal staff. (D ¶ 11; P. Resp. ¶ 11). Plaintiff initially was assigned to manage Fulton County's 14th District, which spans from Inman Park down to the Clayton County line, and includes neighborhoods such as the Vine City, Pittsburgh, Mechanicsville, Lakewood, West End, and Grant Park communities. (D ¶ 12; P. Resp. ¶ 12). She was later

4

reassigned to Fulton County's 17th District, which is comprised of the Buckhead area of Atlanta and parts of Roswell. (D ¶¶ 13-14; P. Resp. ¶¶ 13-14). In the 17th District, Plaintiff supervised a staff of around eleven employees. (D ¶ 15; P. Resp. ¶ 15).

In late 2004 through early 2005, Plaintiff took twelve weeks of FMLA leave when she was hospitalized as a result as a ruptured aneurysm. (D ¶¶ 253-54; P. Resp. ¶¶ 253-54; P ¶ 437; D. Resp. ¶ 437; Deposition of Debra Poole ("Pl. Dep.") [Doc. 191] at 141-42). She suffered short-term memory loss throughout 2004 and early 2005 and states that her memory loss subsided after 2005. (P ¶ 438-39; D. Resp. ¶ 438-39). She never requested a disability accommodation, and her aneurysm did not substantially affect her work performance during the time period relevant to this suit. (P ¶¶ 441-42; D. Resp. ¶¶ 441-42).

The Fulton County Tax Assessor's office is responsible for valuing the properties in over 2700 residential neighborhoods. (D ¶ 20; P. Resp. ¶ 20). The management hierarchy within the Fulton County Tax Assessor's Office is as follows: (1) Chief Appraiser; (2) Assistant Chief Appraiser, (3) Deputy Chief Appraiser, and (4) Appraisal Managers. (D ¶ 21; P. Resp. ¶ 21). Burton Manning served as Chief Appraiser of the Tax Assessor's Office from July 2006 until February 2012. (D ¶¶ 22-23; P. Resp. ¶¶ 22-23). As Chief Appraiser, Manning had the overall responsibility for the Tax

5

Assessor's Office, including approval of all training and travel requests within the department and final decisionmaking authority as to all hiring, promotion, and disciplinary decisions.[4] (D ¶¶ 24-26; P. Resp. ¶¶ 24-26). Tony George served as Assistant Chief Appraiser from June 2006 until April 2010. (D ¶¶ 27-28; P. Resp. ¶¶ 27-28). As Assistant Chief Appraiser, George was responsible for the day-to-day operations of the Tax Assessor's Office, including successfully guiding the office in preparing the annual tax digest and efficiently and effectively handling appeals for Fulton County. (D ¶¶ 29, 92; P. Resp. ¶¶ 29, 92). Douglas Kirkpatrick was hired as the Deputy Chief Appraiser on November 18, 2008. (D ¶¶ 31-32; P. Resp. ¶¶ 31-32).

---

[4] Although Plaintiff denies that Manning was the final decisionmaker as to all hiring, promotion, and disciplinary decisions because "Manning merely 'rubber stamped' the decisions made by George, so long as George had 'dotted his "I's" and crossed his "T's" beforehand,' " (P. Resp. ¶ 25), the Court finds that even if true, Plaintiff's statement does not negate the fact that Manning had ultimate hiring, promotion, and disciplinary decisionmaking authority. Additionally, the deposition testimony Plaintiff cites for her own corresponding statement of material fact does not support the assertion that Manning "would approve whatever George wanted so long as George had 'dotted the Is and crossed the Ts' beforehand and his requests were detailed enough," (*see* P ¶ 275 (citing Deposition of Burton Manning ("Manning Dep.") [Doc. 230] at 67, 85; Deposition of Douglas A. Kirkpatrick ("Kirkpatrick Dep.") [Doc. 299] at 30-31). Consequently, the Court deems Defendant's statement 25—the statement regarding Manning's authority over hiring, promotion, and disciplinary decisions—to be admitted.

AO 72A
(Rev.8/8
2)

As Deputy Chief Appraiser, Kirkpatrick is responsible for the day-to-day operations of the residential division of the Tax Assessor's Office. (D ¶ 33; P. Resp. ¶ 33).

During the time period relevant to the allegations in this suit, there were four Appraisal Managers in the Residential Division: Kevin Maxey, Timothy Brown, Theresa McGruder, and Plaintiff. (P ¶ 5; D. Resp. ¶ 5; D ¶ 35; P. Resp. ¶ 35). Maxey, a male born on January 31, 1968, became employed with Defendant in 1992, was promoted to Appraisal Manager and assigned to the South Region in 2007, and was reassigned to the 14th District in January 2010. (D ¶¶ 36-40; P. Resp. ¶¶ 36-40). Brown, a male "over the age of 40," became employed with Defendant on October 18, 1995, and has served as Appraisal Manager of the North Region since 2004. (D ¶¶ 42-43, 45; P. Resp. ¶¶ 42-43, 45).

For a period of time following the retirement of former Deputy Chief Appraiser Terry Everson and prior to the hiring of current Deputy Chief Kirkpatrick, Tony George directly supervised the four residential appraisal managers. (D ¶ 96; P. Resp. ¶ 96). Many employees, both male and female, disapproved of George's management style, and Plaintiff and George had a strained working relationship. (D ¶¶ 95, 97; P. Resp. ¶¶ 95, 97). She found it very difficult and uncomfortable to interact with him. (D ¶ 98; P. Resp. ¶ 98). His manner was often harsh, rude, and dismissive; he would

7

frown and sometimes walk away while she was speaking to him, was unresponsive to her e-mail correspondence, and often would not even acknowledge receiving it. (D ¶¶ 98-100; P. Resp. ¶¶ 98-100).

On May 13, 2008, George issued Plaintiff a written warning for insubordination and an unexcused absence. (D ¶ 116; P. Resp. ¶ 116). Although Plaintiff had entered a departure notification in the timekeeping system stating that she had to leave early for an emergency, the write-up stated that on Friday, May 9, 2008, Plaintiff left the office at 3:30—one-half hour early—without notifying George. (P ¶¶ 95-97, 100; D. Resp. ¶¶ 95-97, 100).

In July or August 2008, Plaintiff gave Tony Johnson, her subordinate at the time, a performance appraisal of 1.5, indicating that his performance was fair but needed improvement. (P ¶ 129; D. Resp. ¶ 129). George said that he could not believe Plaintiff had the nerve to give someone a 1.5 review score. (P ¶ 135; D. Resp. ¶ 135; Pl. Dep. at 46). Shortly thereafter, in August 2008, Darlene Davis, the Financial Systems Manager for the Fulton County Tax Assessor's Office, presented Plaintiff with a performance appraisal George had prepared for Plaintiff for the period of November 2007 to June 2008. (D ¶¶ 46, 117; P. Resp. ¶¶ 46, 117; P ¶ 145; D. Resp. ¶ 145). George had issued Plaintiff an appraisal rating of 1.5. (D ¶ 118; P. Resp. ¶ 118). In the

8

AO 72A
(Rev.8/8
2)

"performance summary" section of the appraisal form, the reviewer could "summarize the reason for the employee's overall rating, including any strengths or weaknesses that are pertinent to the appraisal." (P ¶¶ 149-50; D. Resp. ¶¶ 149-50). The section was blank. (P ¶ 151; D. Resp. ¶ 151; Deposition of Tony George ("George Dep."), Exh. 12 [Doc. 233-12]). Plaintiff disagreed with the rating she received from George and refused to sign the appraisal. (D ¶ 119; P. Resp. ¶ 119). George also issued a performance appraisal to McGruder in which he gave her a score of 1.6. (P ¶ 157; D. Resp. ¶ 157; Deposition of Theresa R. McGruder ("McGruder Dep.") [Doc. 194] at 26-27).

On October 8, 2008, George sent an interoffice memorandum to Manning recommending that Plaintiff be terminated. (D ¶ 122; P. Resp. ¶ 122). George wrote:

> Debbie Poole has continuously not followed my directive in helping to settle appeals in her section. She is not performing her duties as a Residential Manager in one of the areas of Fulton County that has a significant amount of high residential values. As of last year I had to pick up two new homes that [were] missed by one of Mrs. Poole's appraisers that she supervises. As of right now she has one of her appraisers in Superior Court testifying in a case in which she has not been [there] to support or to testify in this case. Mrs. Poole has continuously shown a lack of interest in her section and a lack of interest in training or following up on her appraisers that she supervises. This type of lack of interest has steadily been getting worse in the two years that I have been here.

AO 72A
(Rev.8/8
2)

(D ¶ 123; P. Resp. ¶ 123). Manning opted not to terminate Plaintiff at that time. (D ¶ 124; P. Resp. ¶ 124).

In March 2009, Plaintiff requested and was granted FMLA leave in connection with her mother's illness. (D ¶ 255; P. Resp. ¶ 255). During the six and one-half weeks Plaintiff was out on FMLA leave, Davis contacted her twice, both times to ask about Plaintiff's mother and see when Plaintiff expected to return to work. (D ¶¶ 258, 260, 268, 270; P. Resp. ¶¶ 258, 260, 268, 270). At some point during her leave, Plaintiff was also contacted by McGruder and another coworker, Tara Parker, who both indicated that George had come to Plaintiff's office and banged on the door as though he were trying to break it down. (D ¶ 261; P. Resp. ¶ 261). Plaintiff did not contact anyone in administration upon receiving the news, but the second time Davis called her, Plaintiff mentioned hearing about the door incident and asked whether there had been a problem. (D ¶¶ 262, 271; P. Resp. ¶¶ 262, 271). Davis indicated that there was not a problem. (D ¶ 272; P. Resp. ¶ 272). Plaintiff nonetheless felt nervous and returned to work the following week. (D ¶ 273; P. Resp. ¶ 273). Upon her return, Plaintiff never spoke to George or Manning about the alleged door incident. (D ¶ 276; P. Resp. ¶ 276).

AO 72A
(Rev.8/8
2)

On July 20, 2009, Plaintiff was summoned to a meeting with Manning. (D ¶ 128; P. Resp. ¶ 128). Manning advised Plaintiff that he was moving in a different direction and that her services were no longer needed. (D ¶ 129; P. Resp. ¶ 129). Plaintiff was presented with the option of retiring or being terminated. (D ¶ 130; P. Resp. ¶ 130). She did not ask Manning for the reason she was being terminated. (D ¶ 131; P. Resp. ¶ 131).

Plaintiff never contacted Manning to let him know whether she would prefer to retire. (D ¶ 132; P. Resp. ¶ 132). On August 7, 2009, Manning sent Plaintiff a letter stating that he had made the decision to terminate her, effective August 10, 2009, and that she could respond to Manning's termination decision by the close of business on August 10, 2009. (D ¶¶ 133-34; P. Resp. ¶¶ 133-34). Tony Johnson, a male born on September 13, 1963, was then reassigned to work as the Appraisal Manager in the 17th District. (D ¶¶ 49, 138; P. Resp. ¶¶ 49, 138).

On July 20, 2009, McGruder was also given the option to retire or be terminated. (P ¶ 211; D. Resp. ¶ 211). McGruder opted to retire in order to keep her pension benefits. (P ¶ 212; D. Resp. ¶ 212). After McGruder left, Maxey moved to the 14th District. (P ¶ 223; P. Resp. ¶ 223; Deposition of Kevin L. Maxey ("Maxey Dep.")

11

[Doc. 228] at 94).  Neither Maxey nor Brown was terminated.  (P ¶ 217; D. Resp. ¶ 217).

Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about September 4, 2009.[5] (D ¶ 279; P. Resp. ¶ 279; Pl. Dep., Exh. 8 [Doc. 191-1 at 19]).  In the section of the form indicating the cause of the alleged discrimination, Plaintiff checked the boxes marked "sex," "age," and "disability," and also checked the box marked "other" and specified "42 USC [§§] 1983 & 1985." (Pl. Dep., Exh. 9 [Doc. 191-1 at 19]).  She also indicated that the discrimination took place from 2008 through July 20, 2009.  *Id*.  The particulars of Plaintiff's charge were as follows:

> I am a Black Female over 40 years of age.  My employer for the last 19 years was the Fulton County Board of Assessors.  I was a supervisor over a number of appraisers in the tax assessors office until I was terminated from my job in July, 2009.  I have been a Level 3 appraiser since 2007, which is a high designation, qualifying me to be a supervisor in the Board of Assessors office.  I was very qualified to perform my job and received many compliments on my job performance and in my job evaluations.  I believe I have been discriminated against because of my sex, age, and disability.
>
> My superior was Assistant Chief Appraiser Tony George (Black Male).  When Mr. George became employed by the Board of Assessors

_____

[5]     The EEOC assigned the matter Charge No. 410-2009-05867. (Pl. Dep., Exh. 8 [Doc. 191-1 at 19]).

AO 72A
(Rev.8/8
2)

he made every effort to assist and give preferential treatment to the men in the office, and make work more difficult for the females. The men received work tools such as Blackberrys (PDAs) and laptop computers, but the females, including me, did not receive such tools for our jobs. The men were allowed to go on educational trips to Las Vegas and Austin, Texas, but the females were not. The females were excluded from Board of Assessor meetings, which we had attended for years until Tony George took over. The men were allowed and encouraged to attend Board Meetings. Tony George and top management ignored the requests of female supervisors and employees, directed and moved our staff around, and transferred staff to different offices without consultation with the females, and refused to communicate with female supervisors about their staff or about staff assignments. However, top management always talked to the males regarding utilization of their staff. Tony George and other top management made every effort to impede the females from performing their jobs effectively, but gave every possible assistance to the males in equal or lesser positions.

On several occasions Human Resources manager Darlene Davis asked me when I was going to retire. I told her I had 6 more years before I could retire at the highest level. Nevertheless, she continued to ask me when I was going to retire.

Recently I was out of work due to an aneurism. I had an operation and a long rehabilitation. I was also out from March to April, 2009 due to Family & Medical Leave Act leave. During this time learned that Tony George had tried to kick down my office door which was locked.

On July 20, 2009 I was called into the office of Chief Appraiser, Burt Manning, and offered the option of termination or retirement. He told me that the BOA was moving in another direction and my services were no longer needed. Shortly thereafter my vacant position was posted and advertised for employees and others to put in requests to be considered for the position.

AO 72A
(Rev.8/8
2)

I believe I have been discriminated against because of my sex, age, and disability in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans With Disabilities Act of 1990, and 42 USC Sections 1983 & 1985.

(*Id*. at 20-21). On September 30, 2010, the EEOC issued a notice of right to sue in which it explained that it was terminating its processing of the charge because more than 180 days had elapsed since the date the Commission assumed jurisdiction over the charge, the Commissioner had not filed suit, and Plaintiff had requested the notice. [Doc. 1-1 at 23].

Plaintiff, along with McGruder and three others, filed suit on December 30, 2010.[6] [Doc. 1]. Plaintiff Poole raises claims in Counts One, Two, Three, and Six. (*See* Am. Compl., *passim*). In Count One, she alleges that Defendant violated the ADA when its management and employees "repeatedly asked her when she was going to retire"; "badgered her while on FMLA leave associated with her disability"; "made clear" that Defendant "did not approve of FMLA leave in connection with [her] disability"; and presented her with the choice of termination or retirement; and when Plaintiff's manager "tried to kick down [her] door while she was on FMLA leave in connection with her disability." (*Id*. ¶ 190). She also states that she was

_____

[6]     On March 21, 2011, the Court granted leave to add a sixth plaintiff. [Doc. 10].

14

AO 72A
(Rev.8/8
2)

"treated differently and subjected to unlawful discrimination by Defendant because of [her] disabilities." (*Id*. ¶ 194). She alleges in Count Two that Defendant violated the ADEA when it allowed its "top management and agents" to repeatedly harass her about when she would retire; denied her "tools, choice assignments and other privileges of employment" that were given to younger employees; and offered her the option of retirement or termination, and subsequently filled her position with a "substantially younger employee, upon information and belief." (*Id*. ¶ 194). She alleges in Count Three that Defendant committed gender discrimination in violation of Title VII when it "repeatedly harassed" her about retirement but did not do the same to male employees; gave younger male employees benefits, tools, and choice assignments to her detriment; criticized the female employees but treated the males with respect; permitted its management to ignore Plaintiff and other females while communicating with male employees; harassed her regarding her FMLA leave without doing the same to male employees; and terminated her employment and replaced her with a male employee. (*Id*. ¶ 211). She also generally avers that "Plaintiffs were treated differently, harassed, humiliated, abused, insulted, ignored, transferred, demoted, reduced in status and responsibility, denied promotions, disciplined, terminated, retaliated against and otherwise discriminated against by Defendant's officers and management based on their

15

AO 72A
(Rev.8/8
2)

gender." (*Id*. ¶ 215). She alleges in Count Six that Defendant violated the FMLA when it harassed her while she was on leave by asking questions about the leave and advising her that management was giving employees a hard time for taking leave; "made clear they did not like FMLA leave"; allowed management to try to kick down her office door while she was on leave; and offered her the option of termination or retirement only a few months after she returned from leave. (*Id*. ¶¶ 236-37, 240-41). Defendant moves for summary judgment on all of Plaintiff's claims. [Doc. 162].

## II.  *Standard of Review*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).

16

The non-moving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999). "If the record presents disputed issues of material fact, the Court may not decide them; rather, it must deny the motion and proceed to trial." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001)).

17

### III.    *Legal Framework*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

The ADEA likewise makes it unlawful for an employer, *inter alia*, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA also prohibits discrimination against any employee because she "has opposed any

AO 72A
(Rev.8/8
2)

practice made unlawful by this section, or because such individual . . . has made a charge, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

The FMLA allows covered employees "to take up to twelve weeks of leave in a twelve-month period for the birth or adoption of a child, or the 'serious health condition' of the employee or the employee's child, spouse, or parent." *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1305-06 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(a)(1)). It also "prohibits an employer from interfering with an employee's attempt to exercise his leave right or retaliating against an employee for opposing practices made unlawful under the FMLA." *Id.* (citing 29 U.S.C. § 2615).

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Under the ADA rubric of discrimination, an employer must make reasonable accommodations that allow a disabled individual to perform her job, unless that accommodation would cause an undue hardship." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998) (citing *Harris v. H & W Contracting*

19

*Co.*, 102 F.3d 516, 519 (11ᵗʰ Cir. 1996), and 42 U.S.C. § 12112(b)(5)(A)). The ADA also proscribes retaliation against a person claiming a right under the ADA or opposing a practice made unlawful by the ADA. 42 U.S.C. § 12203. And although the ADA does not expressly prohibit disability-based harassment and the Eleventh Circuit Court of Appeals has not yet decided the issue, the Circuit has analyzed hostile work environment claims under the ADA under the presumption that they are cognizable. *See Wolfe v. Postmaster Gen.*, 488 Fed. Appx. 465, 469 (11ᵗʰ Cir. Aug. 31, 3012); *see also Gilliard v. Ga. Dept. of Corrs.*, No. 12-11751, 2012 WL 6115913, at *9 (11ᵗʰ Cir. Dec. 7, 2012) (same).

The same general principles governing the order and allocation of proof in cases arising under Title VII apply to claims arising under the ADEA, the FMLA, and the ADA as well. *Smith*, 273 F.3d at 1314 (FMLA); *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11ᵗʰ Cir. 1995) (ADEA); *Vaughn v. NationsBank Corp.*, 137 F. Supp. 2d 1317, 1322 (N.D. Ga. 2000) (Pannell, J.) (ADA). A plaintiff asserting a discrimination claim can support her claim either by direct or circumstantial evidence. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11ᵗʰ Cir. 2002). If direct evidence of intentional discrimination does not exist or is insufficient, a plaintiff may offer circumstantial evidence, using the framework established in *McDonnell Douglas*

AO 72A
(Rev.8/8
2)

*Corp. v. Green*, 411 U.S. 792 (1973). *Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

> This framework requires the plaintiff to establish a *prima facie* case of discrimination, and then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action it took. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. The plaintiff can establish pretext by showing that the employer's non-discriminatory reason should not be believed, or, when considering all the evidence, that it is more likely that the discriminatory reasons motivated the decision than the employer's proffered reasons.

*Lawver*, 300 Fed. Appx. at 772 (citations omitted).

"The methods of presenting a prima facie case are flexible and depend on the particular situation." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). Generally speaking, to satisfy a *prima facie* case for a disparate-treatment claim based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown v. Jacobs*

21

AO 72A
(Rev.8/8
2)

*Eng'g, Inc.*, 401 Fed. Appx. 478, 479-80 (11th Cir. Oct. 28, 2010) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

> Regarding pretext,
>
> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.

*Alvarez*, 610 F.3d at 1265-66 (alteration in original) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks omitted)). To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). In other words, a plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

AO 72A
(Rev.8/8
2)

## IV. Discussion

Defendant moves for summary judgment on Plaintiff's Title VII, ADEA, and FMLA claims on the grounds that Plaintiff cannot establish a *prima facie* case of discrimination. [Doc. 162-2]. With regard to the Title VII and ADEA claims, Defendant argues that there is no evidence the Plaintiff was subjected to an adverse employment action other than her termination or that someone outside of her protected class was treated more favorably. [*Id*. at 5-10]. With regard to the FMLA claim, it contends that Plaintiff is unable to show that Plaintiff's leave in March and April 2009 led to Defendant's decision to terminate her in late July 2009. [*Id*. at 15-18, 19]. Defendant further argues that even if Plaintiff could establish a *prima facie* case with regard to the claims arising from her allegedly wrongful discharge, Defendant can overcome the inference of discrimination with legitimate nondiscriminatory reasons for the decision. [*Id*. at 10-13, 19].

Defendant also moves for summary judgment on Plaintiff's ADA claim, arguing that it is entitled to judgment as a matter of law on the claim because Plaintiff denied during her deposition that she regarded herself as disabled, that she was discriminated against on the basis of any alleged disability, or that she has a disability claim. [Doc. 162-2 at 13-14 (*see also* D ¶ 146)].

AO 72A
(Rev.8/8
2)

Plaintiff, in response, contends that she has established *prima facie* claims of age, gender, and disability discrimination, as well as FMLA retaliation and interference. [Doc. 212-1 at 2].

With regard to the age and gender claims, Plaintiff argues that she was similarly situated with Maxey and Brown, who, Plaintiff argues, are substantially younger males who were treated more favorably. [*Id*. at 6-9]. She further argues that she was subjected to adverse employment actions when she suffered disparate treatment in the form of "withholding of employment privileges," such as a camera, Blackberry communication device, or laptop, permission to attend out-of-state training, or the freedom to disregard timeliness requirements; "undermining of [Plaintiff's] authority," by allowing two of her subordinates to challenge her authority and disregard her work-related directives; a "performance appraisal" tainted by age and gender bias; lack of input on staff changes, hiring and promotion; preclusion from Board of Assessor meetings; general poor treatment by George; and termination. [*Id*. at 9-15 (citing *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006), for the "adverse action" standard, and *Hishon v. King & Spalding*, 467 U.S. 69 (1984), as authority on "what constitutes a 'privilege of employment' ")].

24

In defense of her FMLA claims, Plaintiff alleges that Defendant interfered with her FMLA leave by frightening her into prematurely ending her 2009 FMLA leave and returning to work. [Doc. 212 at 22]. She also argues that she can show facts sufficient to establish causation as to her FMLA retaliation claim. [*Id.* at 23].

With regard to her ADA claim, Plaintiff contends that she is disabled because she has a brain aneurysm that Defendant has known about since 2004 and that she was discriminated against on the basis of the disability when Davis asked her about retirement two to three times and called her twice when she was on FMLA leave in 2009. [Doc. 212-1 at 24 (citing P ¶¶ 431-39, 441-42)]. She also contends that she has overcome Defendant's justifications for the actions giving rise to her ADA claim. [Doc. 212-1 at 24 (citing P ¶¶ 365-73)].

Plaintiff also argues that summary judgment should be denied because Defendant "has not proffered evidence in support of its alleged 'legitimate non-discriminatory reasons' for the adverse employment actions suffered by [Plaintiff] that is extensive enough to succeed on a motion for summary judgment" and because Plaintiff has presented "significantly probative evidence of pretext." [Doc. 212-1 at 2]. She points out that the only adverse action Defendant attempted to justify was her termination and

AO 72A
(Rev.8/8
2)

argues that she can present evidence sufficient to show that Defendant's reasons for terminating her were false and tainted by discriminatory animus. [*Id*. at 16-21].

The arguments and responses are discussed in further detail below. The Court first addresses the arguments regarding Plaintiff's ability to establish that she suffered an employment action that was sufficiently materially adverse to give rise to a *prima facie* case disparate treatment. Second, the Court considers the arguments regarding the remainder of the *prima facie* case as to each claim. Third, it looks to the arguments regarding the proffered nondiscriminatory reasons for the adverse employer activity, and finally, it considers Plaintiff's evidence of pretext.

### A.    *Adverse Employment Action*

Plaintiff contends that she was subjected to adverse employment actions when she suffered disparate treatment in the form of "withholding of employment privileges," such as a camera, Blackberry communication device, or laptop, permission to attend out-of-state training, or the freedom to disregard timeliness requirements; "undermining of [Plaintiff's] authority," by George's allowing two of her subordinates to challenge her authority and disregard her work-related directives; a performance appraisal tainted by age and gender bias; lack of input on staff changes, hiring, and promotion; preclusion from Board of Assessor meetings; general poor treatment by George; and

AO 72A
(Rev.8/8
2)

termination. [Doc. 212-1 at 9-15]. Defendant does not dispute that Plaintiff's termination constituted an adverse employment action, but it does argue that none of the other conduct "rise[s] to the level of an actionable adverse employment action." [*See* Doc. 162-2 at 6].

Plaintiff argues that under *Burlington Northern*, 548 U.S. 53 (2006), an "adverse employment action" in a claim for either disparate treatment or retaliation is any action that (1) has a materially adverse effect on the plaintiff, irrespective of whether it is employment- or workplace-related, or (2) might have dissuaded a reasonable worker from making or supporting a charge of discrimination. [Doc. 212-1 at 10 (citing *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008))]. She further suggests that the unequal distribution of tools such as a camera, Blackberry communication device, or laptop; denial of permission to attend out-of-state training; and requirement that she comply with timeliness rules amounted to impermissible discriminatory denial of a benefit or "privilege of employment" as established in *Hishon*, 467 U.S. 69 (1984). [Doc. 211-1 at 10-11]. Plaintiff is incorrect in both assertions.

First, the Court finds that Plaintiff has not presented the correct standard for determining whether the adverse action attributed to the employer is sufficient to state

a disparate-treatment claim. With regard to the adverse-action standard, the Eleventh

Circuit Court of Appeals has explained the law as follows:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling: the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in

original).

Seven years later, in *Crawford*, the Eleventh Circuit recognized that the Supreme

Court's decision in *Burlington Northern* broadened the type of employer conduct

considered actionable in a *retaliation* claim, from that which adversely affects the

plaintiff's conditions of employment or employment status to that which has a

materially adverse effect on the plaintiff, irrespective of whether it is employment- or

workplace-related. *Crawford*, 529 F.3d at 973. Therefore, in the context of a

retaliation claim, under *Burlington Northern* and *Crawford*, the plaintiff-employee need

AO 72A
(Rev.8/8
2)

only show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination.[7] *See Burlington Northern*, 548 U.S. at 68. Neither *Burlington Northern* nor *Crawford* applies the more-relaxed "materially adverse action" standard to disparate-treatment claims, however. *See Burlington Northern*, 548 U.S. at 62-63 (concluding that the language of Title VII's substantive provision and retaliation provision differed such that employer-conduct standard should be interpreted in one way for disparate-treatment claims and another for retaliation claims); *Crawford*, 529 F.3d at 973 (applying the "more liberal" *Burlington Northern* standard only to the retaliation claim); *see also Ryans v. Whatley*, Civ. Action No. 1:11-CV-46(MTT), 2012 WL 3260412, at *9 n.10 (M.D. Ga. Aug. 8, 2012) (acknowledging "that the Supreme Court's decision in *Burlington Northern* relaxed the standard for proving an adverse employment action in retaliation claims and, consequently, that the standards used in retaliation and discrimination claims are in fact distinct and different"). Thus, because Plaintiff has not presented authority showing that the adverse-action standard applicable to retaliation claims under *Burlington Northern* and

_____

[7]     Thus, in the context of a retaliation claim, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.

*Crawford* also applies to disparate-treatment claims, and because the Court knows of none, the Court evaluates the adverse employer actions stated in Plaintiff's disparate-treatment claims under the standard described above in *Davis. See Davis*, 245 F.3d at 1239.

Second, for the reasons set forth below, the Court finds that Plaintiff has failed to show that any of the employer activity of which she complains—aside from her termination—constitutes an adverse employment action.

### 1. Equipment

The Court is unconvinced by Plaintiff's argument that under *Hishon*, a camera, a Blackberry communication device, or a laptop computer constitutes a condition or privilege of employment within the context of a discrimination claim.

*Hishon* provides a weak analogy to Plaintiff's claims in this case. The Plaintiff in *Hishon* was an associate attorney passed over for partnership in her law firm and consequently terminated. *Hishon*, 467 U.S. at 72. The Court determined that the plaintiff had adequately stated a Title VII claim for discriminatory denial of privileges of employment based on allegations that "would support the conclusion that the opportunity to become a partner was part and parcel of an associate's status as an employee"—namely that the employer "used the prospect of ultimate partnership to

30

induce young lawyers to join the firm" and that it was known among the associates that they "could regularly expect to be considered for partnership at the end of their 'apprenticeships.' " *Id*. at 76. To analogize *Hishon* to the case at hand, the Court would have to find that the promise of receiving camera, a Blackberry communication device, or a laptop was a primary factor inducing employees to work for Defendant, such that it became "a term, condition, or privilege of . . . employment." *See id*. at 75-76.

Plaintiff proffers no facts showing that these things were so central to her employment with Defendant. Additionally, although she states that she needed a camera to perform the functions of her job, she also admits that she would borrow cameras from others or not take photos at all and that there was never a time she did not have access to a camera. (P ¶ 80; D. Resp. ¶ 80; Pl. Dep. at 99[8]). She also states that

_____

[8]        Although Plaintiff states in paragraph 201 of her statements of material fact that, on occasion, not having a camera did prevent her from performing her job functions, her deposition testimony directly contradicts the statement. (Pl. Dep. at 99). A plaintiff cannot, over a defendant's well-taken objections, attempt to create an issue of fact by relying on her affidavit which contradicts her sworn deposition testimony. " 'When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' " *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (quoting *Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc*., 736 F.2d 656, 657 (11th Cir. 1984)). As a result, a court

31

she asked George for a camera once during the time-period relevant to this suit; when he asked, "Do you really need one?" she perceived sarcasm in his tone and "simply responded 'no.' " (P ¶¶ 77-79; D. Resp. ¶¶ 77-79). Furthermore, Plaintiff admits that Blackberrys and laptops were not essential to the performance of her job duties. (P ¶¶ 38, 45), and that she never requested a Blackberry, (D ¶ 178; P. Resp. ¶ 178). Plaintiff also admits that she never filed a grievance or otherwise complained about not having access to a laptop, camera, or Blackberry. (D ¶ 196; P. Resp. ¶ 196). Plaintiff also does not cite any cases in which a court found that a plaintiff provided with tools adequate to do her work suffered an adverse employment action by being denied certain tools she never requested. As a result, the undersigned finds that Plaintiff has failed to show that the unequal distribution of tools and equipment was an adverse employment action.

---

may disregard the conflicting affidavit as a sham. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). Although this rule is applied "sparingly" and only when there is an "inherent inconsistency" between the affidavit and the deposition testimony, *id.*, it is clear that this conflicting testimony presents such a case. The Court therefore disregards paragraph 201 of Plaintiff's statements of material fact and the affidavit testimony that allegedly supports it.

AO 72A
(Rev.8/8
2)

### 2. Attendance at Training and Board Meetings

Plaintiff also contends that she suffered adverse employment actions when she was not selected for out-of-state training and was not invited to Board of Assessor meetings. [Doc. 212-1 at 11-12]. Plaintiff's allegations, taken as true, do not reasonably establish that these denials constituted adverse employment actions.

A denial of training that does not result in the loss of some tangible job benefit does not constitute an adverse action. *McGuire v. Miami-Dade Cnty.*, 418 F. Supp. 2d 1354, 1360 (S.D. Fla. 2006); *Bullock v. Widnall*, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996) ("Although Bullock may very well have benefitted from attending [training] and it may have been insulting to have his subordinate chosen to attend, he has not demonstrated that his non-selection adversely affected the terms or conditions of his employment. . . . For instance, he has not shown that not attending the . . . training course would affect his salary, chances of promotion, ability to perform his job, etc. Consequently, the court is unable to conclude that the denial of training was an adverse employment action."); *Madiedo v. Miami-Dade Cnty.*, Case No. 99-1422, 2000 WL 1763845, at *4 (S.D. Fla. June 1, 2000) ("Generally, denial of training that does not cause the denial of a promotion, bonus, or other benefit does not constitute adverse employment action."); *see also Turlington v. Atlanta Gas*

AO 72A
(Rev.8/8
2)

*Light Co.*, 135 F.3d 1428, 1436 n.15 (11th Cir. 1998) (stating in dicta that plaintiff must establish that defendant denied material training opportunities to him on the basis of age).

Plaintiff does not state that she was denied training altogether or that the out-of-state training she was prevented from attending resulted in the denial of a promotion, bonus, or other benefit, or that it had anything to do with her termination. Instead, she simply states that Maxey and Brown attended out-of-state training and conferences in Nevada and Texas, including a conference that Plaintiff had attended in Georgia in 2007; that the female residential appraisal managers did not attend any out-of-state conferences during the time relevant to the claims in this suit; and that Maxey and Brown "never shared any of the educational material they had received at the conferences with the female residential appraisal managers." (P ¶¶ 63-69). She also admits that she never asked George or Manning why she was not invited to attend the conferences in Nevada and Texas and that she never filed a grievance about not being invited to attend. (D ¶¶ 233-34; P. Resp. ¶¶ 233-34). Because Plaintiff has not demonstrated that any alleged denial in training caused a "serious and material change in a term, condition or privilege in her employment," she has not established a *prima facie* case on this claim. *See Harvey v. City of Bradenton,*

34

No. 804CV1748TEAJ, 2005 WL 3533155, at *5 (M.D. Fla. Dec. 22, 2005) ("Plaintiff does not provide any legal support for the proposition that denial of training requests can constitute an adverse employment action. This conduct . . . does not affect Plaintiff's salary, title, position, or job duties. Neither does Plaintiff present any evidence that the training denied was an important condition of employment."); *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406-07 (5th Cir. 1999) (denial of training to fulfill her back-up duties not an adverse employment action).

The Court also concludes that Plaintiff's claim of being excluded from bi-weekly Board of Assessors meetings does not amount to an adverse employment action. She admits that she never asked Manning for permission to attend Board of Assessor meetings, (D ¶ 211; P. Resp. ¶ 211), and never states that she was forbidden to attend the meetings, (P ¶ 185 (noting that Plaintiff inferred that she was not welcome at the meetings)). She has also failed to produce any evidence that her failure to be included in those meetings impacted her ability to do her job, had anything to do with her termination, or changed her job duties. Without such evidence, Plaintiff cannot show that she suffered an adverse employment action as a result of not being invited to the meetings. *See Rogers-Libert v. Miami-Dade Cnty.*, 184 F. Supp. 2d 1273, 1285-86 (S.D. Fla. 2001) (finding that plaintiff's exclusion from meetings was not an adverse

AO 72A
(Rev.8/8
2)

employment action because she suffered no "loss in salary or benefits, subsequent denial of promotions, workplace reassignment, transfer or change in her permanent job title.").

### 3. Involvement in Personnel Decisions

Plaintiff also contends that she "was disparately treated with regard to input on staff changes, hiring, and promotion." [Doc. 212-1 at 12]. She states that George would transfer her staff members without giving her any prior notice or seeking her input, (P ¶ 158; D. Resp. ¶ 158; Pl. Dep. at 69), and that there were times that Maxey and Brown knew of changes that were going to be made to Plaintiff's staff before she knew about the changes, (P ¶¶ 159-64; D. Resp. ¶¶ 159-64). Plaintiff also indicates that prior to George joining the Assessor's Office in 2006, Plaintiff was "always a member of the hiring and promotion panels," but that after George joined the office, George, Maxey, and Brown participated in the panels and Plaintiff did not. (P ¶¶ 169-70; D. Resp. ¶¶ 169-70).

Once again, Plaintiff has not proffered any cases showing that these employer actions, even if true, constituted an adverse employment action. Nor has she raised any argument that making staffing decisions and participating in hiring and promotion panels had been a significant portion of her responsibilities prior to George joining the

36

office. Consequently, Plaintiff's allegations are insufficient to establish that she suffered an adverse employment action. Again, to constitute an adverse employment action, the employer's action must severe and material and is judged objectively from the view of a reasonable employee. *Davis*, 245 F.3d at 1239. "An employment action [] is not adverse merely because the employee dislikes it or disagrees with it." *Collier v. Clayton Cnty. Cmty. Serv. Bd.*, 236 F. Supp. 2d 1345, 1378 (N.D. Ga. 2002) (Carnes, J.) (finding that, where there was no reduction in pay or title, reduction in plaintiff's supervisory responsibility from approximately 280 employees to ten did not constitute adverse employment action); *see also Dillon v. Morano*, 497 F.3d 247, 250, 254 (2d Cir. 2007) (holding that plaintiff's exclusion from certain meetings of "top staff and administrative personnel" that plaintiff had previously attended did not constitute adverse employment action). *Compare Robertson v. Ala. Dep't of Econ. & Cmty. Affairs*, 902 F. Supp. 1473, 1481 (M.D. Ala. 1995) (finding genuine issue of material fact as to adverse action where defendant transferred plaintiff from office building to warehouse, moved her from supervisory position to one with no subordinates, substantially increased her workload, and changed her performance evaluation from high marks to "meets standards" when she fell behind). Without additional context, no reasonable factfinder could determine that Plaintiff suffered a reduction her job

37

responsibilities so significant as to be considered a serious and material change in her employment.

### *4. Timeliness Requirements and Performance Evaluations*

Plaintiff also alleges that she suffered adverse employment actions when George wrote her up when she violated an attendance requirement once due to a personal emergency, [Doc. 212-1 at 12 (citing P ¶¶ 93-119)], and gave her a "biased" performance evaluation in July or August of 2008, [Doc. 212-1 at 12-13 (citing P ¶¶ 126-36, 140-54, 292-93)]. A written reprimand will not constitute an adverse employment action unless it leads "to [a] tangible harm in the form of lost pay or benefits." *Wallace v. Ga. Dep't of Transp.*, 212 Fed. Appx. 799, 801 (11th Cir. Dec. 13, 2006). There is no allegation that the reprimand for untimeliness had any effect on Plaintiff's pay or benefits, or that it had any repercussions at all. (*See* P ¶¶ 93-119). As a result, Plaintiff cannot show that she was subject to an adverse employment action as a result of the 2008 written reprimand for attendance.

In contrast, Plaintiff alleges that there is evidence that Manning used George's 2008 performance appraisal as part of his justification for ending Plaintiff's employment. [Doc. 212-1 at 13 (citing P ¶¶ 292-93)]. The first statement of material fact Plaintiff cites is unopposed and states that "Manning alleged in his March 2012

38

deposition that [Plaintiff] committed 'gross errors in judgment' with regard to 'chasing sales,' and that the problem had not been corrected."  (P ¶ 292; D. Resp. ¶ 292).  The second statement of material fact states that "Manning points to Poole's 2008 Performance Appraisal, which was issued by George, in support of this allegation." (P ¶ 293).  Defendant objects to the statement on the grounds that the evidence cited does not support the fact alleged.  (D. Resp. ¶ 293).  A review of the cited transcript reveals that the performance appraisal being discussed is co-plaintiff McGruder's and not Plaintiff's; consequently, the objection is due to be **SUSTAINED**.  (*See* Manning Dep. at 161).  The undersigned is therefore at a loss to understand how either statement or the evidence allegedly supporting it shows that Manning relied on Plaintiff's 2008 performance appraisal when deciding to end her employment.[9]

The Court therefore finds that Plaintiff has failed to present evidence sufficient to allow a reasonable factfinder to determine that either the timeliness write-up or the 2008 performance evaluation was an adverse employment action.

---

[9]    The Court also notes that in its motion for summary judgment, Defendant does not rely on the 2008 performance appraisal George issued Plaintiff as evidence that Defendant had legitimate nondiscriminatory reasons for terminating Plaintiff's employment.  [*See* Doc. 162-2, *passim*; Doc. 222, *passim*].

AO 72A
(Rev.8/8
2)

### 5. *Undermining Plaintiff's Authority*

Plaintiff further alleges that George allowed—and may have even actively encouraged—two of Plaintiff's subordinates to challenge her authority and disregard her work-related directives "in order to undermine [her] authority and to diminish the quality of her work, simply so that George would have a justification for recommending [Plaintiff's] termination." [Doc. 212-1 at 12 (citing P ¶¶ 114-390)]. Here again, Plaintiff fails to show that her allegations, even if true, resulted in a loss of pay, benefits, title, responsibilities, prestige, or any other serious and material change in the terms, conditions, or privileges of her employment. Indeed, although she states that both of the employees took time out of the office that Plaintiff did not authorize and that one of the employees was slow at collecting data and entering data into the system, (P ¶ 114-39), she also states that she "always got her reports done in a timely fashion, and never once received a verbal or written warning or critique from George, . . . Kirkpatrick . . . or Manning for any work-related performance deficiencies whatsoever." (P ¶ 124). Plaintiff also does not attempt to draw any link between the insubordination and her eventual termination. [Doc. 212-1 at 12]. As a result, the Court finds that under the assumption that Plaintiff's allegations are true, they do not constitute an adverse employment action.

40

### 6. *"Poor Treatment"*

Plaintiff also argues that she suffered an adverse employment action "with regard to how George treated her generally." [Doc. 212-1 at 12]. Clearly, Plaintiff has shown evidence sufficient to allow a reasonable person to find that George was a miserable boss. However, it is well settled that general allegations of poor treatment are insufficient to show that a plaintiff suffered an adverse employment action.

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII [because] Title VII is not a 'general civility code.'" *Reeves v. C.H. Robinson Worldwide. Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). To rise to the level of an actionable Title VII claim, employment decisions must work a material alteration on the terms of employment, as opposed to being merely petty slights or trivial annoyances. *See Davis*, 245 F.3d at 1239. The asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Filius v. Potter*, 176 Fed. Appx. 8, 10 (11th Cir. Mar. 15, 2006). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239. While the Court can certainly see that a reasonable person could find that much of the

AO 72A
(Rev.8/8
2)

conduct about which Plaintiff complains was petty and annoying, the Court does not find that Plaintiff has presented evidence sufficient for a reasonable factfinder to determine that the conduct was a serious and material alteration to the terms of her employment. *See also Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1214 (10th Cir. 2003) (holding that "poor treatment" by supervisor, including disagreements over work specifications, "unsubstantiated oral reprimands," and "unnecessary derogatory comments," even in front of employees supervised by plaintiff, did not constitute materially adverse employment action). Thus, Plaintiff's conclusory allegation that she was subject to an adverse employment action "with regard to how George treated her generally" is unavailing.

### 7. *Summary*

For all of these reasons, the undersigned finds that, aside from her termination, none of the conduct Plaintiff alleges was sufficiently objectively serious or tangible to constitute an adverse employment action. The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** summary judgment to Defendant on this ground on all of Plaintiff's disparate-treatment claims except for those arising from her termination.

AO 72A
(Rev.8/8
2)

**B.     Challenges to Other Elements of Plaintiff's Prima Facie Claims of Discrimination**

Having narrowed Plaintiff's disparate-treatment claims to those arising from her termination, the Court now turns to the portions of Defendant's motion for summary judgment in which it challenges Plaintiff's ability to establish other *prima facie* elements of her claims.

**1.     Title VII and ADEA**

In order to prove a *prima facie* case of disparate-treatment under Title VII, a plaintiff must prove that she was: "(1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class."  *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002). Similarly, a plaintiff establishes a *prima facie* case of age discrimination under the ADEA if she shows: "(1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she

AO 72A
(Rev.8/8
2)

was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (citing *Turlington*, 135 F.3d at 1432 (citations omitted)).

Aside from the adverse-employment-action argument, the only other element of Plaintiff's Title VII or ADEA case that Defendant challenges is the comparator element. Defendant argues first that Plaintiff cannot show that she was replaced by a male employee or an employee who was substantially younger. [Doc. 162-2 at 7-9]. It then argues that because it terminated a male employee for failing to adequately manage and supervise his staff, Plaintiff cannot establish that a similarly situated male employee was treated more favorably than she. [*Id.* at 9-10].

In support of the first argument, Defendant explains that each employment position in Fulton County is assigned a unique position identification number, (D ¶ 139; P. Resp. ¶ 139). [Doc. 162-2 at 8]. That unique number corresponds to and identifies the position for personnel tracking purposes, (D ¶ 139; P. Resp. ¶ 139). [Doc. 162-2 at 8]. Defendant also shows that as of her retirement date, Plaintiff held position number 0011101, (D ¶ 140; P. Resp. ¶ 140; Affidavit of Darlene M. Davis ("D. Davis Aff.") [Doc. 173] ¶ 11), and that in or around February 2010, a 42-year-old female employee named Tara Parker was promoted into the position identified as position number 0011101, (D ¶ 141; P. Resp. ¶ 141), and assigned to the South Region,

44

(D ¶ 142; P. Resp. ¶ 142).  [Doc. 163-2 at 8].  Although the argument is not entirely clear, it appears that Defendant is contending that this shows that when Plaintiff was terminated, she was replaced by Parker rather than Johnson and therefore was not replaced by a male or a "substantially younger" person.  [*See* Doc. 162-2 at 8].

The undersigned finds this argument unconvincing for two reasons.  First, it is unclear why Fulton County's internal tracking system would have any relevance to Plaintiff's discriminatory-termination claims.   The claims arise from Plaintiff's termination from the Appraisal Manager position in the 17th District; regardless of whether Parker or Johnson was then assigned the "unique position identification number" Plaintiff had held, the facts at this stage of the case show that upon Plaintiff's termination, Johnson was transferred to fill the Appraisal Manager opening in the 17th District, (D ¶ 138; P. Resp. ¶ 138).  Making all reasonable inferences in Plaintiff's favor, as the Court must on a motion for summary judgment, the undersigned finds that these facts are sufficient to enable a reasonable factfinder to determine that Parker replaced Plaintiff after she was terminated from the Appraisal Manager position in the 17th District.  Defendant's argument includes no citations to law and Defendant does not proffer any other reason Plaintiff should not enjoy this legal presumption.  [*See* Doc. 162-2 at 8-9].

45

Second, even if the position identification numbers did have some legal effect, the facts Defendant proffers do not show that Plaintiff was not replaced by a "substantially younger" person. To succeed on an ADEA claim, the plaintiff must show that she was replaced by someone "substantially younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Plaintiff was born on May 25, 1956, (D ¶ 2; P. Resp. ¶ 2), and Parker was born on October 26, 1969, (D ¶ 58; P. Resp. ¶ 58); thus, Plaintiff is approximately thirteen years and five months older than Parker.

It appears that Defendant is proceeding on the theory that a person within the plaintiff's protected age class cannot, as a matter of law, be considered "substantially younger" for the purposes of the ADEA. [*See* Doc. 162-2 at 7-9]. This is not true. *See O'Connor*, 517 U.S. 308, 313 (holding that "replacement by someone outside the protected class" is not a proper element of a *prima facie* case under the ADEA and that whether one person lost out to another in the protected class is "irrelevant, so long as he has lost out because of his age") (italics omitted). Indeed, the Eleventh Circuit has found that a plaintiff showing that she was replaced by a person who was more than forty years old and only four years younger than she had presented a *prima facie* case of age discrimination under *McDonnell Douglas*. *Carter v. City of Miami*, 870 F.2d 578, 583 (11th Cir. 1989) (noting that "age is a continuum along which the

46

AO 72A
(Rev.8/8
2)

distinctions between employees are often subtle and relative" and finding that replacement of a fifty-year-old with a forty-six-year-old was sufficient to establish a *prima facie* case of age discrimination) (internal quotation marks omitted). Given this precedent, the undersigned cannot recommend granting any portion of Defendant's motion for judgment on the ground that Parker was not "substantially younger" than Plaintiff within the context of an ADEA claim.

In support of its second argument—that Plaintiff cannot establish that a similarly situated male employee was treated more favorably because Defendant also terminated "other upper management employees who failed to perform up to expectations"—Defendant points out that "in 2007 or 2008, Manning terminated male employee Robin Baker, Deputy Chief Appraiser of the Commercial/Industrial Division, for failing to adequately manage and supervise his staff." [Doc. 162-2 at 10 (referring to D ¶ 144)]. This summary statement is wholly insufficient to establish that Plaintiff and Baker were similarly situated.

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)

47

(quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (11th Cir. 1998)); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Jones*, *supra* (citations and quotations omitted). In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia*, 171 F.3d at 1368-69 (citation omitted); *see also Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Here, Defendant has failed to show that Plaintiff and Baker were similarly situated in all relevant respects. First, Plaintiff was an Appraisal Manager in the Residential Division, and Baker was a Deputy Chief Appraiser in the Commercial Division. Thus, it appears that Plaintiff's and Baker's positions carried significantly different responsibilities. Second, Defendant presents absolutely no facts regarding Baker's disciplinary history or any warnings he may have received regarding his performance. Third, Defendant presents no evidence showing Baker's management

48

and supervision deficiencies or how they compared to any of Plaintiff's. As a result, the Court finds Defendant's argument that Baker was similarly situated to Plaintiff to be unavailing.

For all of these reasons, the undersigned concludes that Defendant has failed to show on summary judgment that Plaintiff cannot establish a *prima facie* case of disparate treatment with regard to her termination claims under Title VII or the ADEA.

### 2. *ADA Claim*

"In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) [s]he is disabled; (2) [s]he was a 'qualified individual' at the relevant time, meaning that [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against because of h[er] disability." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Chapman v. U.S. Postal Serv.*, 442 Fed. Appx. 480, 484 (11th Cir. Oct. 4, 2011).

49

Defendant argues that Plaintiff cannot establish any of the prongs of a *prima facie* case of disability discrimination because she denied during her deposition that she regarded herself as disabled, that she was discriminated against on the basis of any alleged disability, or that she has a disability claim. [Doc. 162-2 at 13-14 (*see also* D ¶ 146)]. In response, Plaintiff contends that as a layperson she should not be held to putative admissions regarding legal terms of art. (P. Resp. ¶ 146). She further contends that she is disabled because she has a brain aneurysm, which ruptured in 2004 and caused her to experience short-term memory loss in 2004 and 2005 and caused her to need to take FMLA leave while she was hospitalized in intensive care. (P ¶¶ 431-37; D. Resp. ¶¶ 431-37). She also avers that the aneurysm is a permanent condition for which Plaintiff has periodic check-ups and currently takes Ecotrin. (P ¶¶ 431-35; D. Resp. ¶¶ 431-35). She then alleges—without citing any additional evidence—that she was discriminated against on the basis of the disability when Defendant's management and employees "repeatedly asked her when she was going to retire"; "badgered her while on FMLA leave associated with her disability"; "made clear" that Defendant "did not approve of FMLA leave in connection with [her] disability"; and presented her with the choice of termination or retirement; and when Plaintiff's

50

manager "tried to kick down [her] door while she was on FMLA leave in connection with her disability." (Am. Compl. ¶ 190 [cited in Doc. 212-1 at 24]).

In reply, Defendant argues that the evidence upon which Plaintiff relies is "completely conclusory and based on [her] speculation, opinions, or beliefs" and that Plaintiff has produced no evidence that Defendant terminated her because of her disability. [Doc. 222 at 15].

Given Plaintiff's scant presentation, the Court has no choice but to agree with Defendant. Assuming that the notice Plaintiff gave Defendant of her need to take FMLA leave in 2004 and 2005 created a record of her aneurysm and that the aneurysm may properly be considered "a physical or mental impairment that substantially limits one or more of [Plaintiff's] major life activities," Plaintiff has failed to even argue, much less show evidence, that her aneurysm led Defendants to undertake any of the conduct about which Plaintiff complains. *See Lucas*, 257 F.3d at 1255.

Plaintiff's failure to respond to Defendant's arguments concerning causation mandates that summary judgment on this claim be entered against Plaintiff. *Floyd v. Home Depot U.S.A., Inc*., 274 Fed. Appx. 763, 765 (11th Cir. Apr. 17, 2008); *Edmondson v. Bd. of Trustees of Univ. of Ala*., 258 Fed. Appx. 250, 253 (11th Cir. Dec. 4, 2007) ("In opposing a motion for summary judgment, a party may not

AO 72A
(Rev.8/8
2)

rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).[10] A party has an obligation to respond to an argument raised in a motion for summary judgement. *See Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1139 (N.D. Ga. 2007) (Forrester, J.) (granting summary judgment as to plaintiff's state law claims because plaintiff did not respond to defendant's summary judgment motion on those claims); *Burnett v. Northside Hosp.*,

_____

[10]     These cases appear to conflict with another line of Eleventh Circuit cases which direct district courts to review a motion for summary judgment and supporting documents to determine whether genuine issues of material fact exist despite a party's failure to respond. *See Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039-40 (11th Cir. 2004); *United States v. One Piece of Prop., 5800 S.W. 4th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).

    The Court resolves the conflict in the following manner. Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond. Where, however, the non-movant fails to address a particular claim asserted in the summary judgment motion, but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional, and therefore consider the claim abandoned.

342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (Duffey, J.) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (Hull, J.) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims."). This Court is not under a duty to exercise imagination or conjure what a party might have argued, but did not argue; nor is this Court obliged to do Plaintiff's (or her counsel's) work. *See Resolution Trust Corp.*, 43 F.3d at 599 (noting that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000) (holding that "[i]t is not for the court to manufacture arguments on Plaintiff's behalf"). Thus, Plaintiff has abandoned her ADA claim. *See Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (holding that issues not briefed are deemed abandoned); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (Hunt, J.) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned.").

53

AO 72A
(Rev.8/8
2)

The undersigned therefore **RECOMMENDS** that the District Judge **GRANT** Defendant's motion for summary judgment as to the ADA claim on grounds of abandonment.[11]

### 3.    *FMLA Claim*

As previously noted, a plaintiff may bring two types of claims under the FMLA: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, . . . , and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act . . . ." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting *Strickland*, 239 F.3d at 1206).    To state a claim for interference with a substantive right under the FMLA, the plaintiff "need only

_____

[11]    The Court further notes that had Plaintiff not abandoned the claim, it appears that Plaintiff is complaining about adverse actions that took place in 2008 and 2009.    Given that approximately four years lapsed between the date Plaintiff's aneurysm was apparently revealed to Defendant (sometime in late 2004) and when any putative adverse event may have taken place in 2008, without allegations that Plaintiff's job was affected by the aneurysm anytime after 2005 or any other evidence linking the aneurysm to Defendant's adverse conduct, it appears highly unlikely that Plaintiff would have been able to establish causation, even had she attempted to do so.

AO 72A
(Rev.8/8
2)

demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206-07. "Interfering with" the exercise of FMLA rights includes both "refusing to authorize FMLA leave . . . [and] discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). When bringing an interference claim, "[t]he employee need not allege that his employer intended to deny the benefit—the employer's motives are irrelevant." *Hurlbert*, 439 F.3d at 1293. Conversely, to state a claim for retaliation under the FMLA, the plaintiff "must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right"; in other words, the plaintiff shoulders the increased burden of showing that the defendant's actions "were motivated by an impermissible or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted).

With regard to Plaintiff's FMLA count, Defendant presumes that she raises only a retaliation claim and moves for summary judgment on the ground that Plaintiff cannot show causation. [Doc. 162-2 at 15-18, 19]. In response, Plaintiff argues that she can establish causation on a retaliation claim and also asserts that she has raised a viable claim for interference with the exercise of her FMLA rights. [Doc. 212-1 at 21-23]. The Court addresses each claim in turn.

AO 72A
(Rev.8/8
2)

### a.    Retaliation

A *prima facie* case of retaliation under the FMLA requires a showing that "(1) the employee engaged in statutorily protected conduct," (2) she suffered a materially adverse action, and "(3) there is a causal connection between the two."[12] *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).  The plaintiff may satisfy the causal-relation element by showing that "the protected activity and adverse action were 'not wholly unrelated.' " *Id.*  Although an inference of causation can be established by showing close temporal proximity between the statutorily protected activity and the adverse employment action, if there is no other evidence of causation, the temporal proximity must be very close.  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that a three-month disparity was insufficiently close). Additionally, in a retaliation case, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Id.*

---

[12]    As discussed above, because *Burlington Northern* and *Crawford* broadened the type of employer conduct considered actionable in a retaliation claim, the Court finds it more appropriate to refer to the "adverse employment action" element of a retaliation claim as the "materially adverse action" element.  *See Crawford*, 529 F.3d at 973-74; *Burlington Northern*, 548 U.S. at 67.

56

AO 72A
(Rev.8/8
2)

Defendant moves for summary judgment on Plaintiff's FMLA retaliation claim on the ground that Plaintiff is unable to show causation between her FMLA leave and her termination. It argues both that temporal proximity is too attenuated to lead to an inference of causation and that, even if temporal proximity were sufficient, Defendant cut off the inference of causation when it contemplated terminating Plaintiff's employment prior to her FMLA leave. [Doc. 162-2 at 17-20].

First, Defendant points out that Plaintiff requested and was granted FMLA leave in connection with her mother's illness in early March 2009 and was out for six and one-half weeks—until about the middle of April, (D ¶¶ 255, 258; P. Resp. ¶¶ 255, 258; P ¶ 380; D ¶ 380)—and that Plaintiff was notified of her termination three months later, on July 20, 2009, (D ¶¶ 128-30; P. Resp. ¶¶ 128-30; P ¶ 383; D. Resp. ¶ 383). [Doc. 162-2 at 17-18]. It argues that, standing alone, the three-month gap is too long to allow an inference that the exercise of Plaintiff's FMLA rights led to Defendant's decision to terminate her employment. [*Id.* at 18 (citing *Drago*, 453 F.3d 1307-08)].

Second, Defendant contends that the performance appraisal George issued to Plaintiff in the August 2008 and the October 8, 2008, interoffice memorandum recommending Plaintiff's termination "clearly establish[] that management contemplated terminating Plaintiff before she ever exercised any rights under the

57

FMLA." [Doc. 162-2 at 19]. It argues that this renders any length of temporal proximity insufficient to establish causation. [*Id*. at 19-20 (citing *Drago*, 453 F.3d at 1308; *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir. 1996) (finding no inference of causation where supervisors gave plaintiff a final warning about his job status before they knew of his discrimination complaints); *Robinson v. AFA Serv. Corp.*, 870 F. Supp. 1077, 1084 (N.D. Ga. 1994) (finding absence of causal link, despite sufficient temporal proximity, where decisionmakers developed plaintiff's termination plan one month before her discharge))].

In response, Plaintiff asserts that she was "meeting her employer's legitimate expectations at the time she went out on FMLA and was terminated roughly three months after returning from FMLA." [Doc. 212-1 at 22]. She further asserts that she has a claim sufficient to survive summary judgment because (1) there is no evidence that Manning seriously contemplated firing Plaintiff prior to her FMLA leave; (2) even if he did, Plaintiff was never warned regarding her job performance, which she argues distinguishes her case from the cases Defendant cites; and (3) "the attendant circumstances give rise to the inference of retaliatory intent." [*Id*. at 22-23 (citing P ¶¶ 383-430)]. In reply, Defendant simply incorporates by reference the

AO 72A
(Rev.8/8
2)

arguments it made in the brief supporting its motion for summary judgment. [Doc. 222 at 14].

Because Defendant argues that Manning made the decision to terminate Plaintiff's employment, (D ¶¶ 25, 127), and has argued only that George—not Manning—seriously contemplated firing Plaintiff prior to her FMLA leave, [Doc. 162-2 at 19], the Court finds Defendant's argument on that Defendant seriously considered terminating Plaintiff's employment prior to her FMLA leave to be unavailing. Nevertheless, lacking other evidence of causation, three months between the protected activity and adverse action is too attenuated to raise an inference of causation. *Drago*, 453 F.3d at 1308. The Court therefore considers whether the "attendant circumstances" Plaintiff describes "give rise to the inference of retaliatory intent." [*See* Doc. 212-1 at 23 (citing P ¶¶ 383-430)].

Plaintiff states that the following shows Defendant's intent to retaliate against her for taking FMLA leave. During the six and one-half weeks Plaintiff was out on FMLA leave, Davis contacted her twice, both times to see when Plaintiff expected to return to work. (D ¶¶ 258, 260, 268, 270; P. Resp. ¶¶ 258, 260, 268, 270). The first time Davis contacted Plaintiff, she told her Plaintiff had been approved for up to twelve weeks of FMLA leave. (P ¶ 414; D. Resp. ¶ 414). At some point during her FMLA leave,

59

Plaintiff was also contacted by McGruder and Parker, who both indicated that George had come to Plaintiff's office and banged on the door as though he were trying to break it down. (D ¶ 261; P. Resp. ¶ 261; Pl. Dep. at 114-15). During the same period, someone also told Plaintiff that Rebecca Canada, another employee, was being given a "hard time" while on FMLA. (P ¶ 406; D. Resp. ¶ 406; Pl. Dep 146-48). Plaintiff did not contact anyone in administration upon receiving the information, but the second time Davis called her, Plaintiff mentioned hearing "about FMLA" and about the door incident and asked whether there had been a problem. (D ¶¶ 262, 271; P. Resp. ¶¶ 262, 271; Pl. Dep. at 138). Davis indicated that there was not a problem. (D ¶ 272; P. Resp. ¶ 272). Plaintiff nonetheless felt nervous and returned to work the following week, even though she was approved to take up to twelve weeks of leave. (D ¶¶ 254, 273; P. Resp. ¶¶ 254, 273). Upon her return, Plaintiff never spoke to George or Manning about the alleged door incident, but so many other people came to Plaintiff to tell her about it that she eventually told them to stop telling her. (D ¶ 276; P. Resp. ¶ 276; P ¶ 391; D. Resp. ¶ 391).

Also in support of her intent argument, Plaintiff states that she also heard George say that he did not like FMLA and make disparaging comments related to FMLA. (P ¶¶ 415-16; D. Resp. ¶¶ 415-16). Canada was unfairly disciplined in 2008 for

AO 72A
(Rev.8/8
2)

unexcused absences while on FMLA leave and was required to perform work during her leave. (P ¶¶ 407-12; D. Resp. ¶¶ 407-12). In May 2009, Kirkpatrick called Plaintiff into his office; there, she heard Kirkpatrick state to the County attorney that it was George's idea to force Canada to complete work while out on FMLA leave. (P ¶ 427; D. Resp. ¶ 427). Additionally, George once made Leann Rossi, another employee, disclose her disability to him before he allowed her to go to an appointment, even though she had already filled out the appropriate FMLA paperwork. (P ¶ 417; D. Resp. ¶ 417).

Accepting all of these statements as true, as it must on a motion for summary judgment, the Court finds that they are insufficient to enable a reasonable jury to find that Defendant intended to retaliate against Plaintiff for taking FMLA leave when it terminated her employment three months after her return from leave. First, aside from the fact that it took place while Plaintiff was on FMLA leave, nothing in the facts Plaintiff cites indicate that the door incident had anything to do with FMLA. Second, there are no allegations that McGruder's and Parker's calls to Plaintiff regarding the door incident were sanctioned by or made under the direction of Defendant. Third, there is no evidence that Davis called excessively or did anything more than attempt to determine when Plaintiff intended to return from her leave. Fourth, even under the

AO 72A
(Rev.8/8
2)

assumption that George was the decisionmaker or heavily influenced Manning's decision to terminate Plaintiff, it is unclear how George's interference with Canada's FMLA leave and his requirement that Rossi disclose her condition to him have any relation to Plaintiff's allegedly retaliatory discharge. Fifth, there is no evidence that any of George's negativity regarding FMLA took place after December 2008 and was therefore close enough in time to Plaintiff's dismissal to raise an inference of discrimination.

For these reasons, the Court finds that Plaintiff has not established a genuine issue of material fact as to Defendant's intent to retaliate against Plaintiff for exercising her right to take FMLA leave. The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment on the retaliation claim Plaintiff raises under the FMLA.

### b. Interference

Again, to state a claim for interference with a substantive right under the FMLA, the plaintiff need only demonstrate by a preponderance of the evidence that she was entitled the benefit and that Defendant interfered with or denied her the benefit. *Krutzig*, 602 F.3d at 1235 (citing *Strickland*, 239 F.3d at 1206-07). The plaintiff need

AO 72A
(Rev.8/8
2)

not allege intent to deny the benefit because " 'the employer's motives are irrelevant.' " *Krutzig*, 602 F.3d at 1235 (citing *Strickland*, 239 F.3d at 1208).

Plaintiff contends that Defendant interfered with her FMLA leave by frightening her into ending her FMLA leave early and returning to work. [Doc. 212 at 22 (citing P ¶¶ 383-421)]. She again points to the two calls Davis made to her during her FMLA leave, McGruder's and Parker's calls to her regarding the incident where George banged on her office door while she was out on FMLA leave, George's disparaging comments about the FMLA, and the FMLA-related incidents Canada and Rossi experienced. [Doc. 212 at 22 (citing P ¶¶ 383-421)].

Despite the fact that Plaintiff need not show intent, it does appear unlikely that on this evidence Plaintiff will succeed on a claim that Defendant interfered with her 2009 FMLA leave. Defendant, however, only summarily states that Plaintiff "fails to adduce evidence sufficient to establish a prima facie case of interference with her FMLA rights." [Doc. 222 at 15 (citing *Strickland*, 239 F.3d at 1207; *Harley v. Health Ctr. of Coconut Creek, Inc.*, 487 F. Supp. 2d 1344, 1357 (S.D. Fla. 2006))]. Defendant proffers no legal or factual argument, and the Court's review of *Strickland* and *Harley* reveals that those cases do not involve fact patterns wherein a plaintiff alleged that the employer interfered with her FMLA leave by intimidating her into cutting her approved

63

leave short. As noted above, on a motion for summary judgment, the moving party carries the initial burden of "informing the court of the basis for its motion." *Rice-Lamar*, 232 F.3d at 840; *see also* N.D. Ga. R. 7.1A(1) (providing that "[e]very motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority").

Because Defendant has proffered no argument or analogous case law, the undersigned finds that it has not met the initial burden it must bear on a motion for summary judgment. The undersigned therefore **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment—to the extent that Defendant has asserted such a motion on this claim—on its contention that Plaintiff failed to establish a *prima facie* case of interference under the FMLA.

### C. *Legitimate Nondiscriminatory Reasons and Pretext*

Defendant also argues that it had legitimate nondiscriminatory reasons for Plaintiff's termination and that there is no evidence Plaintiff can present to show that the reasons were pretextual. [Doc. 162-2 at 10-13]. Plaintiff, in turn, contends that Defendant's evidence is insignificant and that, in any case, she can show abundant evidence of pretext. [Doc. 212-1 at 15-21].

AO 72A
(Rev.8/8
2)

Under the *McDonnell-Douglas* framework, if a plaintiff establishes a *prima facie* case, she has created an inference of discrimination, and the defendant has the burden of articulating a legitimate, non-discriminatory reason for its employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). This burden is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). "[T]he defendant must merely proffer non-[discriminatory] based reasons, not prove them." *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994). That is, the employer must only introduce admissible evidence to support the challenged employment actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). "Although this burden is not onerous, . . . neither is it a mere formality." *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting *Burdine*, 450 U.S. at 253). At this stage, a defendant-employer must:

> clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant.

*Id.* (quoting *Burdine*, 450 U.S. at 253). To meet its rebuttal burden in this circuit, the defendant must also proffer "evidence that asserted reasons for discharge were actually relied on." *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990).

AO 72A
(Rev.8/8
2)

If the defendant meets this light burden, then the inference of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Brooks*, 446 F.3d at 1162 (quoting *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272); *Holifield*, 115 F.3d at 1565. Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson*, 376 F.3d at 1088 (quoting *Burdine*, 450 U.S. at 253).

Interestingly, despite the reason Manning gave Plaintiff at the time she was dismissed, the reasons Defendant now proffers for terminating Plaintiff's employment are less about showing that Plaintiff's services did not fit into Manning's "new direction" and more about suggesting that Plaintiff was fired because her performance was lacking. Defendant first points to Manning's deposition testimony, in which he states that Plaintiff "was not working with management" to perform needed functions relating to appraisals, "the digest," and "the management of the staff." (D ¶ 106; P. Resp. ¶ 106; Manning Dep. at 123). Second, Defendant notes Kirkpatrick's testimony that he had concerns about Plaintiff's general appraisal practices and about a specific practice called "sales chasing" and presents Manning's

testimony that Kirkpatrick told him of his concerns.[13] (D ¶ 107; P. Resp. ¶ 107). Third, it points to the October 8, 2008, interoffice memorandum George sent to Manning in which he recommended that Plaintiff's employment be terminated. (D ¶ 122; P. Resp. ¶ 122). It notes that in the memorandum George wrote that Plaintiff had not followed his directive in helping to settle appeals in her section; was not performing her duties as a Residential Manager overseeing a high-value area; and was displaying a lack of interest in her section and in training or "following up on" her subordinates. (D ¶ 123; P. Resp. ¶ 123). George also wrote in the memo that he perceived the lack of interest to be getting worse over the previous two years. (D ¶ 123; P. Resp. ¶ 123). Fourth, Defendant notes Manning's additional testimony that although he agreed that Plaintiff was "lax in keeping staff production levels up," he opted not to terminate her at the time he received George's memo. (D ¶ 124; P. Resp. ¶ 124). He states that later,

_____

[13] "Sales chasing" does not have a standard definition. Plaintiff and Defendant appear to agree with Kirkpatrick's description:

It is when a property sells and the appraiser or the appraiser's office changes characteristics simply to change the value to mirror or closely match the sale price irrespective of the actual physical nature of the property . . . the reasons you would do that generally are to obtain an acceptable ratio for the state revenue department's evaluation.

(D ¶ 111; P. Resp. ¶ 111).

after he had not seen a significant level of improvement, he made the decision to terminate Plaintiff's employment. (D ¶ 127).[14]

Although the proffered reasons are a departure from Manning's contemporaneous statement that Plaintiff's employment was being terminated because the office was going in a "new direction," the Court finds that this evidence is nevertheless sufficient to meet Defendant's light burden of production of evidence showing legitimate nondiscriminatory reasons for Plaintiff's termination. The burden therefore returns to Plaintiff to establish that (or at this stage at least show a genuine issue of material fact as to whether) Defendant's articulated reasons for her termination are pretextual. Plaintiff's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing*

---

[14]    Manning also states that rather than terminate Plaintiff in 2008 upon George's recommendation, he decided to work with Plaintiff to increase her staff production levels and ensure that she and her staff were utilizing proper appraisal practices. (D ¶ 125). He states that after he had numerous performance-improvement discussions with Plaintiff and she did not show significant improvement, he decided to terminate her employment. (D ¶¶ 126-27). Plaintiff denies that Manning worked with Plaintiff to improve her performance or that any performance discussions took place. (P. Resp. ¶¶ 125-27 (citing Affidavit of Debra Poole ("Pl. Aff.") [Doc. 207] ¶ 22)). As it must for the purposes of summary judgment, the Court resolves these issues in Plaintiff's favor and therefore does not consider them as part of Defendant's justification for Plaintiff's termination.

AO 72A
(Rev.8/8
2)

*Prods., Inc.*, 530 U.S. 133, 148 (2000). If, however, "the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024-25 (emphasis added).

In her response brief, Plaintiff both questions the credibility of Defendant's proffered reasons for her termination and argues that the evidence shows that Defendant more likely than not acted with a discriminatory motive. [Doc. 212-1 at 15-21]. With regard to the credibility of Defendant's proffered reasons for her dismissal, Plaintiff first asserts that "in an employment environment where housing data and managerial decisions were extensively documented and reported on," it is "strange" that George's 2008 memo recommending Plaintiff's termination is Defendant's only documentary evidence alleging specific work deficiencies. [*Id*. at 17]. Second, she points to Manning's testimony that it was not uncommon for George to write people up without good grounds to do so. (P ¶¶ 229, 262; Manning Dep. at 66). Third, she states that other than the 2008 write-up, she was never disciplined by George for not following an order. (P ¶ 233; D. Resp. ¶ 233). Fourth, she states that she was "consistently in the office supervising her staff." (P ¶ 254; D. Resp. ¶ 254). Fifth, she points out that Rossi

and McGruder thought she was a "high-quality appraisal manager." (P ¶ 255; D. Resp. ¶ 255). Sixth, she notes that Kirkpatrick never pointed to a single instance of "sales chasing" by Plaintiff. (P ¶ 302; D. Resp. ¶ 302). Seventh, Plaintiff presents testimony that the real estate market started falling in 2008, leading to the reasonable inference that sales chasing became a non-issue well before the date of Plaintiff's termination. (P ¶ 324 (Kirkpatrick Dep. at 126)). Eighth, Plaintiff points out that neither Manning, George, nor Kirkpatrick told her of a deficiency in her performance or told her that her job was in jeopardy if she failed to improve her performance. (P ¶¶ 343-44, 348, 424-25; D. Resp. ¶¶ 343-44, 348, 424-25). Ninth, she testifies that she always got her reports done in a timely fashion and that from 2008 to July 20, 2009, she was never written up for "failing to adhere to jobs and deadlines." (P ¶¶ 349, 354; D. Resp. ¶¶ 349, 354). Tenth, Plaintiff testifies that she was always well-prepared for staff meetings and provided quantitative data when necessary. (P ¶ 362; Pl. Aff. ¶¶ 61-62).[15] The Court also notes that at the time of Plaintiff's termination Manning did not

---

[15] Plaintiff also states that in all of her time at the Assessor's Office, she was written up only once and for just a minor infraction, (P ¶¶ 228, 234, 355, 364, 374), and that the 2008 performance appraisal was the only unsatisfactory performance appraisal she received during her entire tenure with Defendant, (P ¶ 230). The evidence Plaintiff cites is not supportive, however, and the Court therefore disregards the assertions. For example, in P ¶ 234, Poole claims that other than the 2008 Poole Write-Up, she was never disciplined while with the Assessor's Office, and citing Poole Dep. at 27.

state that Plaintiff was being fired for failing to adequately perform her job duties, for failing to "keep staff production levels up," or for "chasing sales," but instead he told her that her services were no longer needed because he was "moving in a different direction." (D ¶ 129; P. Resp. ¶ 129).

With regard to evidence that Defendant acted with discriminatory motive, Plaintiff cites her own deposition testimony stating that during one staff meeting, George emphasized that even though some people had been at the Assessor's Office for a long time, those people should not "get used to it" because they would not be there much longer. (P ¶ 376; D. Resp. ¶ 376). Second, she points to the fact that George wrote her up for a very minor infraction regarding an unapproved absence, but did not reprimand Maxey, Brown, Davis, or Johnson for "more egregious related infractions." (P ¶¶ 95-97, 100; D. Resp. ¶¶ 95-97, 100; Pl. Dep. at 70). Third, she points to the fact that George did not give her the same tools, training, and opportunity to attend high-level meetings that he gave to Maxey and Brown. [Doc. 212-1 at 19 (*see, e.g.,* P ¶¶ 54-55, 60 (laptops); 68 (out-of-state training), 169 (participation in hiring panel); 30, 199 (Blackberry communication devices))]. Fourth, she states that "the record is bereft of any evidence indicating that Manning conducted an independent investigation into the

———————————

However, nowhere on page 27 of Poole's deposition is this fact discussed.

allegations contained within George's 2008 termination memo."[16] [Doc. 212-1 at 19-20].

In reply, Defendant characterizes Plaintiff's evidence as "unsupported" and "self-serving," contends that Plaintiff is essentially urging the Court to second-guess Defendant's business decision to terminate her employment, and argues that Plaintiff's contentions rest on her own perception of her performance. [Doc. 222 at 12]. Apparently wishing to imply that Manning did not rely on George's termination memo when making the decision to terminate Plaintiff's employment, Defendant also points out that George's termination memo predated Manning's decision to terminate Plaintiff's employment by nine months. [*Id.* at n.21].

Although a significant portion of Plaintiff's argument does rely on self-serving testimony regarding her own perception of her performance, she also presents objective statements of fact regarding her disciplinary history and points out evidence undermining Manning's stated reasons for terminating her. Additionally, Defendant itself argues that George's termination memo is evidence that Defendant had legitimate

---

[16]    Plaintiff also avers that Manning testified that he relied in part on the 2008 performance appraisal in his decision to terminate Plaintiff's employment. [Doc. 212-1 at 19 (citing P ¶ 293)]. The Court finds that the deposition testimony cited does not support this allegation but instead refers to the performance appraisal of another employee. The Court therefore disregards it as inapplicable to Plaintiff's case.

AO 72A
(Rev.8/8
2)

nondiscriminatory reasons for firing Plaintiff, thereby implying that Manning—the decisionmaker—relied at least in part upon the memo in making the decision to fire Plaintiff. *See IMPACT*, 893 F.2d at 1194 (requiring that there must be "evidence that asserted reasons for discharge were actually relied on or the reasons are not sufficient to meet defendant's rebuttal burden").

Importantly, Defendant does not reply with evidence showing any independent basis for Manning's determination that Plaintiff's performance was lacking. [*See* Doc. 220 at 11]. Rather, it relies on Manning's conclusory testimony that her terminated Plaintiff's employment because he had not seen a significant improvement in her performance. Consequently, Defendant has provided no grounds for finding that Manning came to this conclusion independent of George's influence.

In short, the undersigned recommends that Defendant's summary judgment motion be denied as to Plaintiff's termination because the reasons proffered for her termination now (poor performance) are different than the one stated at the time of her termination (moving in a different direction), and the reasons Defendant proffers for her poor performance are criticisms made by a non-decisionmaker (George) and not by

AO 72A
(Rev.8/8
2)

the decisionmaker (Manning) or as a result of the decisionmaker's independent assessment of Plaintiff's performance.[17]

Accordingly, the undersigned finds that Plaintiff has proffered evidence sufficient to allow a reasonable factfinder to determine that George acted with discriminatory animus, that Manning acted on information George provided that was tainted by discriminatory animus, and that Defendant's proffered reasons for the termination of Plaintiff's employment were not true.[18] *See Clark*, 990 F.2d at 1228

---

[17]     The Court also observes that the facts in this case are different than those in *D'Allessandro v. City of Newark*, 454 Fed. Appx. 53, 56 (3d Cir. Dec. 13, 2011). In that case, like the case presently before the Court, the decisionmaker also told the plaintiff that the termination was because "it was going in a different direction," but in defending the discrimination case, the city proffered evidence of the plaintiff's poor performance. There, however, unlike the case at hand, the plaintiff did not counter the employer's proffer with evidence that this performance had, in fact, been good. Thus, in light of Poole's evidence countering Defendant's contention that she was terminated for poor performance, the *D'Allessandro* Court's holding—that the city's statement that it is changing direction "[wa]s not inconsistent with its desire to move away from employees with the deficits exhibited by [plaintiff]" when the plaintiff did not "dispute the truth of his documented performance deficiencies"—does not apply here. *Id.*

[18]     Although Defendant does not point to the evidence, it bears noting that Plaintiff alleged as an undisputed material fact that "Manning further alleges that 'the sales ratios' would confirm that [Plaintiff] and McGruder were 'chasing sales.' " (P ¶ 295 (citing Manning Dep. at 161); *see also* P ¶ 292). On the face of the statement, this appears to support an inference that Manning independently corroborated George's opinion regarding "sales chasing." However, because the statement is not particularly clear (in particular, it is not clear how sales ratios resulting from sales chasing would be different from sales ratios resulting from a falling housing market or—more

(noting that a plaintiff may avoid summary judgment by presenting probative evidence showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action"). Thus, Plaintiff has raised a genuine issue of material fact as to whether Defendant's proffered nondiscriminatory reasons for her termination are pretextual. The undersigned therefore **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment on the Title VII and ADEA disparate-treatment claims arising from Plaintiff's termination.

## V. *Conclusion*

For the reasons set forth above, the undersigned **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment as to (1) Plaintiff's disparate-treatment claims under Title VII and ADEA that arise from Plaintiff's termination, and (2) Plaintiff's claim of interference under the FMLA, and **GRANT** the motion for summary judgment on all of the remaining claims. [Doc. 162]. Reports and

---

importantly—that Manning relied on sales ratios when he made the decision to end Plaintiff's employment) and Defendant does not rely on the statement as evidence showing that Plaintiff was terminated for a legitimate non-discriminatory reason, the undersigned finds the statement to be insufficient to overcome Plaintiff's showing of pretext.

AO 72A
(Rev.8/8
2)

Recommendations on the remaining pending summary-judgment motions will be forthcoming under separate cover.

   **IT IS SO RECOMMENDED**, this the 8th day of February, 2013.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)